**UNITED STATES of America**

**v.**

**Fawaz YUNIS, a/k/a Nazeeh, Appellant.**

**No. 89–3208.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1990.

Decided Jan. 29, 1991.

Francis D. Carter, Washington, D.C. (appointed by the court), for appellant.

John F. De Pue, Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., and Jennifer E. Levy, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before MIKVA, Chief Judge, WALD and RUTH BADER GINSBERG, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Appellant Fawaz Yunis challenges his convictions on conspiracy, aircraft piracy, and hostage-taking charges stemming from the hijacking of a Jordanian passenger air-

craft in Beirut, Lebanon. He appeals from orders of the district court denying his pretrial motions relating to jurisdiction, illegal arrest, alleged violations of the Posse Comitatus Act, and the government's withholding of classified documents during discovery. Yunis also challenges the district court's jury instructions as erroneous and prejudicial.

Although this appeal raises novel issues of domestic and international law, we reject Yunis' objections and affirm the convictions.

## I. BACKGROUND

On June 11, 1985, appellant and four other men boarded Royal Jordanian Airlines Flight 402 ("Flight 402") shortly before its scheduled departure from Beirut, Lebanon. They wore civilian clothes and carried military assault rifles, ammunition bandoleers, and hand grenades. Appellant took control of the cockpit and forced the pilot to take off immediately. The remaining hijackers tied up Jordanian air marshals assigned to the flight and held the civilian passengers, including two American citizens, captive in their seats. The hijackers explained to the crew and passengers that they wanted the plane to fly to Tunis, where a conference of the Arab League was under way. The hijackers further explained that they wanted a meeting with delegates to the conference and that their ultimate goal was removal of all Palestinians from Lebanon.

After a refueling stop in Cyprus, the airplane headed for Tunis but turned away when authorities blocked the airport runway. Following a refueling stop at Palermo, Sicily, another attempt to land in Tunis, and a second stop in Cyprus, the plane returned to Beirut, where more hijackers came aboard. These reinforcements included an official of Lebanon's Amal Militia, the group at whose direction Yunis claims he acted. The plane then took off for Syria, but was turned away and went back to Beirut. There, the hijackers released the passengers, held a press conference reiterating their demand that Palestin-ians leave Lebanon, blew up the plane, and fled from the airport.

An American investigation identified Yunis as the probable leader of the hijackers and prompted U.S. civilian and military agencies, led by the Federal Bureau of Investigation (FBI), to plan Yunis' arrest. After obtaining an arrest warrant, the FBI put "Operation Goldenrod" into effect in September 1987. Undercover FBI agents lured Yunis onto a yacht in the eastern Mediterranean Sea with promises of a drug deal, and arrested him once the vessel entered international waters. The agents transferred Yunis to a United States Navy munitions ship and interrogated him for several days as the vessel steamed toward a second rendezvous, this time with a Navy aircraft carrier. Yunis was flown to Andrews Air Force Base from the aircraft carrier, and taken from there to Washington, D.C. In Washington, Yunis was arraigned on an original indictment charging him with conspiracy, hostage taking, and aircraft damage. A grand jury subsequently returned a superseding indictment adding additional aircraft damage counts and a charge of air piracy.

Yunis filed several pretrial motions, among them a motion to suppress statements he made while aboard the munitions ship. In *United States v. Yunis (Yunis I)*, 859 F.2d 953 (D.C.Cir.1988), this court reversed a district court order suppressing the statements, and authorized their introduction at trial. We revisited the case on a second interlocutory appeal relating to discovery of classified information, reversing the district court's disclosure order. *United States v. Yunis (Yunis II)*, 867 F.2d 617 (D.C.Cir.1989).

Yunis admitted participation in the hijacking at trial but denied parts of the government's account and offered the affirmative defense of obedience to military orders, asserting that he acted on instructions given by his superiors in Lebanon's Amal Militia. The jury convicted Yunis of conspiracy, 18 U.S.C. § 371 (1988), hostage taking, 18 U.S.C. § 1203 (1988), and air piracy, 49 U.S.C. App. § 1472(n) (1988). However, it acquitted him of three other

charged offenses that went to trial: violence against people on board an aircraft, 18 U.S.C. § 32(b)(1) (1988), aircraft damage, 18 U.S.C. § 32(b)(2) (1988), and placing a destructive device aboard an aircraft, 18 U.S.C. § 32(b)(3) (1988). The district court imposed concurrent sentences of five years for conspiracy, thirty years for hostage taking, and twenty years for air piracy. Yunis appeals his conviction and seeks dismissal of the indictment.

## II. ANALYSIS

Yunis argues that the district court lacked subject matter and personal jurisdiction to try him on the charges of which he was convicted, that the indictment should have been dismissed because the government seized him in violation of the Posse Comitatus Act and withheld classified materials useful to his defense, and that the convictions should be reversed because of errors in the jury instructions. We consider these claims in turn.

### A. *Jurisdictional Claims*

Yunis appeals first of all from the district court's denial of his motion to dismiss for lack of subject matter and personal jurisdiction. *See United States v. Yunis*, 681 F.Supp. 896 (D.D.C.1988). Appellant's principal claim is that, as a matter of domestic law, the federal hostage taking and air piracy statutes do not authorize assertion of federal jurisdiction over him. Yunis also suggests that a contrary construction of these statutes would conflict with established principles of international law, and so should be avoided by this court. Finally, appellant claims that the district court lacked personal jurisdiction because he was seized in violation of American law.

### 1. Hostage Taking Act

■ The Hostage Taking Act provides, in relevant part:

(a) [W]hoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or to abstain

from any act ... shall be punished by imprisonment by any term of years or for life.

(b)(1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—

(A) the offender or the person seized or detained is a national of the United States;

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203. Yunis claims that this statute cannot apply to an individual who is brought to the United States by force, since those convicted under it must be "found in the United States." But this ignores the law's plain language. Subsections (A), (B), and (C) of section 1203(b)(1) offer *independent* bases for jurisdiction where "the offense occurred outside the United States." Since two of the passengers on Flight 402 were U.S. citizens, section 1203(b)(1)(A), authorizing assertion of U.S. jurisdiction where "the offender or the person seized or detained is a national of the United States," is satisfied. The statute's jurisdictional requirement has been met regardless of whether or not Yunis was "found" within the United States under section 1203(b)(1)(B).

■ Appellant's argument that we should read the Hostage Taking Act differently to avoid tension with international law falls flat. Yunis points to no treaty obligations of the United States that give us pause. Indeed, Congress intended through the Hostage Taking Act to execute the International Convention Against the Taking of Hostages, which authorizes any signatory state to exercise jurisdiction over persons who take its nationals hostage "if that State considers it appropriate." International Convention Against the Taking of Hostages, *opened for signature* Dec. 18, 1979, art. 5, para. 1, 34 U.N. GAOR Supp. (No. 39), 18 I.L.M. 1456, 1458. *See* H.R. CONF. REP. No. 1159, 98th Cong., 2d Sess.

418 (1984), *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS 3182, 3710, 3714.

 Nor is jurisdiction precluded by norms of customary international law. The district court concluded that two jurisdictional theories of international law, the "universal principle" and the "passive personal principle," supported assertion of U.S. jurisdiction to prosecute Yunis on hijacking and hostage-taking charges. *See Yunis*, 681 F.Supp. at 899–903. Under the universal principle, states may prescribe and prosecute "certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism," even absent any special connection between the state and the offense. *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES §§ 404, 423 (1987) [hereinafter RESTATEMENT]. Under the passive personal principle, a state may punish non-nationals for crimes committed against its nationals outside of its territory, at least where the state has a particularly strong interest in the crime. *See id.* at § 402 comment g; *United States v. Benitez*, 741 F.2d 1312, 1316 (11th Cir.1984) (passive personal principle invoked to approve prosecution of Colombian citizen convicted of shooting U.S. drug agents in Colombia), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 698 (1985).

Relying primarily on the RESTATEMENT, Yunis argues that hostage taking has not been recognized as a universal crime and that the passive personal principle authorizes assertion of jurisdiction over alleged hostage takers only where the victims were seized because they were nationals of the prosecuting state. Whatever merit appellant's claims may have as a matter of international law, they cannot prevail before this court. Yunis seeks to portray international law as a self-executing code that trumps domestic law whenever the two conflict. That effort misconceives the role of judges as appliers of international law and as participants in the federal system. Our duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law. *See* U.S. CONST. art. VI. As we said in *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929 (D.C.Cir.1988): "Statutes inconsistent with principles of customary international law may well lead to international law violations. But within the domestic legal realm, that inconsistent statute simply modifies or supersedes customary international law to the extent of the inconsistency." *Id.* at 938. *See also Federal Trade Comm'n v. Compagnie de Saint–Gobain–Pont–a–Mousson*, 636 F.2d 1300, 1323 (D.C.Cir.1980) (U.S. courts "obligated to give effect to an unambiguous exercise by Congress of its jurisdiction to prescribe even if such an exercise would exceed the limitations imposed by international law").

 To be sure, courts should hesitate to give penal statutes extraterritorial effect absent a clear congressional directive. *See Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922). Similarly, courts will not blind themselves to potential violations of international law where legislative intent is ambiguous. *See Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations, if any other possible construction remains...."). But the statute in question reflects an unmistakable congressional intent, consistent with treaty obligations of the United States, to authorize prosecution of those who take Americans hostage abroad no matter where the offense occurs or where the offender is found. Our inquiry can go no further.

#### 2. Antihijacking Act

 The Antihijacking Act provides for criminal punishment of persons who hijack aircraft operating wholly outside the "special aircraft jurisdiction" of the United States, provided that the hijacker is later "found in the United States." 49 U.S.C.

App. § 1472(n). Flight 402, a Jordanian aircraft operating outside of the United States, was not within this nation's special aircraft jurisdiction. *See* 49 U.S.C. App. § 1301. Yunis urges this court to interpret the statutory requirement that persons prosecuted for air piracy must be "found" in the United States as precluding prosecution of alleged hijackers who are brought here to stand trial. But the issue before us is more fact-specific, since Yunis was indicted for air piracy while awaiting trial on hostage-taking and other charges; we must determine whether, once arrested and brought to this country on those other charges, Yunis was subject to prosecution under the Antihijacking Act as well.

The Antihijacking Act of 1974 was enacted to fulfill this nation's responsibilities under the Convention for the Suppression of Unlawful Seizure of Aircraft (the "Hague Convention"), which requires signatory nations to extradite or punish hijackers "present in" their territory. Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, art. 4, para. 2, Dec. 16, 1970, 22 U.S.T. 1643, 1645, T.I.A.S. No. 7192. *See* H. REP. No. 885, 93d Cong., 2d Sess. 10 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 3975, 3978; S. REP. No. 13, 93d Cong., 1st Sess. 1, 3 (1973). This suggests that Congress intended the statutory term "found in the United States" to parallel the Hague Convention's "present in [a contracting state's] territory," a phrase which does not indicate the voluntariness limitation urged by Yunis. Moreover, Congress interpreted the Hague Convention as requiring the United States to extradite or prosecute "offenders in its custody," evidencing no concern as to how alleged hijackers came within U.S. territory. S. REP. No. 13, 93d Cong., 1st Sess. at 3; *see* H. REP. No. 885, 93d Cong., 2d Sess. at 10, 1974 U.S.Code Cong. & Admin. News 3978 (Hague Convention designed to close "gap" in Tokyo Convention, which did not require states to prosecute or extradite hijackers "in [their] custody"). From this legislative history we conclude that Yunis was properly indicted under section 1472(n) once in the United States and under arrest on other charges.

The district court correctly found that international law does not restrict this statutory jurisdiction to try Yunis on charges of air piracy. *See Yunis*, 681 F.Supp. at 899–903. Aircraft hijacking may well be one of the few crimes so clearly condemned under the law of nations that states may assert universal jurisdiction to bring offenders to justice, even when the state has no territorial connection to the hijacking and its citizens are not involved. *See id.* at 900–01; *United States v. Georgescu*, 723 F.Supp. 912, 919 (E.D.N.Y.1989); RESTATEMENT § 404 & reporters' note 1, § 423; Randall, *Universal Jurisdiction under International Law*, 66 TEX.L. REV. 785, 815–34 (1988). But in any event we are satisfied that the Antihijacking Act authorizes assertion of federal jurisdiction to try Yunis regardless of hijacking's status vel non as a universal crime. Thus, we affirm the district court on this issue.

### 3. Legality of Seizure

Yunis further argues that even if the district court had jurisdiction to try him, it should have declined to exercise that jurisdiction in light of the government's allegedly outrageous conduct in bringing him to the United States. This claim was rejected by the district court before trial. *See United States v. Yunis*, 681 F.Supp. 909, 918–21 (D.D.C.1988), *rev'd on other grounds*, 859 F.2d 953 (*Yunis I*).

Principally, Yunis relies on *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), in which the court held that due process requires courts to divest themselves of personal jurisdiction acquired through "the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Id.* at 275. *Toscanino* establishes, at best, only a very limited exception to the general rule (known as the *"Ker–Frisbie* doctrine") that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" *Frisbie v. Collins*, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952) (citing, *inter alia, Ker v. Illinois*, 119 U.S. 436, 7

S.Ct. 225, 30 L.Ed. 421 (1886)). *Toscanino's* rule has, moreover, been limited to cases of "torture, brutality, and similar outrageous conduct," *United States* ex rel. *Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975), and the Supreme Court has since reaffirmed the *Ker-Frisbie* doctrine, *see Immigration and Naturalization Serv. v. Lopez–Mendoza*, 468 U.S. 1032, 1039, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984); *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980).

Even assuming, arguendo, that a district court could correctly dismiss a case otherwise properly before it for the reasons given in *Toscanino*, we find no merit in Yunis' claim. In *Yunis I*, we reviewed the facts of Operation Goldenrod in some detail, including the deception used to arrest Yunis, his injuries and hardships while in custody, and the delay between his arrest and arraignment in the United States. The court sought to determine whether or not these circumstances voided Yunis' waiver of Fifth and Sixth Amendment rights; we concluded that while the government's conduct was neither "picture perfect" nor "a model for law enforcement behavior," the "discomfort and surprise" to which appellant was subjected did not render his waiver invalid. *Yunis I*, 859 F.2d at 969. Similarly, we now find nothing in the record suggesting the sort of intentional, outrageous government conduct necessary to sustain appellant's jurisdictional argument. *Cf. Sami v. United States*, 617 F.2d 755, 774 (D.C.Cir.1979) (finding "no shocking behavior characterized by abduction or brutality which would support an actionable constitutional claim").

### B. *Posse Comitatus Act*

 Next, Yunis appeals from the district court's denial of his motion to dismiss on the basis of the government's alleged violation of the Posse Comitatus Act, 18 U.S.C. § 1385 (1988), which establishes criminal penalties for willful use of "any part of the Army or the Air Force" in law enforcement, unless expressly authorized by law. *See United States v. Yunis*, 681 F.Supp. 891 (D.D.C.1988). Despite the Posse Comitatus Act's express limitation to the Army and Air Force, appellant seeks dismissal of the indictment on the grounds that the Navy played a direct role in Operation Goldenrod.

We cannot agree that Congress' words admit of any ambiguity. By its terms, 18 U.S.C. § 1385 places no restrictions on naval participation in law enforcement operations; an earlier version of the measure would have expressly extended the bill to the Navy, but the final legislation was attached to an Army appropriations bill and its language was accordingly limited to that service. *See* H.R. REP. No. 71, Part II, 97th Cong., 1st Sess. 4 (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 1781, 1786 [hereinafter H.R. REP. No. 71]; Note, *The* Posse Comitatus *Act: Reconstruction Politics Reconsidered*, 13 AM.CRIM.L.REV. 703, 709–10 (1976). Reference to the Air Force was added in 1956, consistent with reassignment of Army aviation responsibilities to that new branch of the military. *See* H.R. REP. No. 71 at 4, 1981 U.S.Code Cong. & Admin.News 1786. Nothing in this history suggests that we should defy the express language of the Posse Comitatus Act by extending it to the Navy, and we decline to do so. *Accord United States v. Roberts*, 779 F.2d 565, 567 (9th Cir.), *cert. denied*, 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986); *see* H.R. REP. No. 71 at 4, U.S.Code Cong. & Admin.News 1786 (Navy "not legally bound" by Posse Comitatus Act).

Furthermore, some courts have taken the view that the Posse Comitatus Act imposes no restriction on use of American armed forces abroad, noting that Congress intended to preclude military intervention in domestic civil affairs. *See Chandler v. United States*, 171 F.2d 921, 936 (1st Cir. 1948), *cert. denied*, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949); *D'Aquino v. United States*, 192 F.2d 338, 351 (9th Cir. 1951), *cert. denied*, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343 (1952). And even if these difficulties could be overcome, a remedial problem would remain, as dismissal of all charges against Yunis might well be

an inappropriate remedy if violations of the Posse Comitatus Act were found. *See United States v. Cotten*, 471 F.2d 744, 749 (9th Cir.) (rejecting dismissal as remedy for alleged violation of Posse Comitatus Act on *Ker–Frisbie* grounds), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *see also United States v. Hartley*, 796 F.2d 112, 115 (5th Cir.1986) (noting courts' hesitation to adopt exclusionary rule for violations of Posse Comitatus Act); *United States v. Roberts*, 779 F.2d at 568 (refusing to adopt exclusionary rule).

Nor is Yunis helped by 10 U.S.C. § 375 (1988), which requires the Secretary of Defense to issue regulations prohibiting "direct participation" by military personnel in a civilian "search, seizure, arrest, or other similar activity" unless expressly authorized by law. Reliance on this provision faces the same remedial hurdle as direct reliance on the Posse Comitatus Act: Under the *Ker–Frisbie* doctrine, outright dismissal of the charges against Yunis would not be an appropriate remedy for legal violations relating to his arrest. *See United States v. Crews*, 445 U.S. at 474, 100 S.Ct. at 1251. Nor would a violation of the regulations at issue amount to a constitutional violation, making application of an exclusionary rule or similar prophylactic measures inappropriate. *See United States v. Caceres*, 440 U.S. 741, 754–55, 99 S.Ct. 1465, 1472–73, 59 L.Ed.2d 733 (1979).

■ In any event, we agree with the district court that no governmental illegality occurred. Regulations issued under 10 U.S.C. § 375 require Navy compliance with the restrictions of the Posse Comitatus Act, but interpret that Act as allowing "indirect assistance" to civilian authorities that does not "subject civilians to the exercise of military power that is regulatory, proscriptive, or compulsory in nature." 32 C.F.R. § 213.10(a)(7) (1987). The regulations are consistent with judicial interpretations of the Posse Comitatus Act; in fact, they incorporate one of three tests employed to identify violations. *See Yunis*, 681 F.Supp. at 892 (setting out three tests); *United States v. McArthur*, 419 F.Supp. 186, 194 (D.N.D.1975) ("[T]he feared use which is

prohibited by the posse comitatus statute is that which is regulatory, proscriptive or compulsory in nature ...."), *aff'd sub nom. United States v. Casper*, 541 F.2d 1275 (8th Cir.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977).

The district court found that Navy personnel played only a "passive" role in housing, transporting, and caring for Yunis while he was in the custody of the FBI, and that "[n]one of the Navy's activities constituted the exercise of regulatory, proscriptive, or compulsory military power." *Yunis*, 681 F.Supp. at 895–96. Nor did the Navy's participation in Operation Goldenrod violate either of the other judicial tests for violations of the Posse Comitatus Act: The Navy's role did not amount to "direct active involvement in the execution of the laws," and it did not "pervade the activities of civilian authorities." *Id.* at 895. We see no error in this assessment of the record, and accordingly conclude that no violation of military regulations occurred.

### C. Discovery Claim

■ Yunis appeals from the district court's denial of his motion to dismiss on the basis that pre-trial discovery provisions of the Classified Information Procedures Act (CIPA), 18 U.S.C. App. (1988), infringe upon procedural protections guaranteed him by the Fifth and Sixth Amendments. *See* Pretrial Memorandum Order No. 13, *Yunis*, Crim. No. 87–0377 (D.D.C. Feb. 15, 1989), *reproduced in* Appellant's Appendix at Tab 14. In light of our holding in *Yunis II* that CIPA "creates no new rights of or limits on discovery" of classified material, but only requires courts to consider secrecy concerns when applying general discovery rules, we find no merit in this claim. *Yunis II*, 867 F.2d at 621–22; *accord United States v. Anderson*, 872 F.2d 1508, 1514 (11th Cir.) ("[N]o new substantive law was created by the enactment of CIPA."), *cert. denied*, —— U.S. ——, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); *cf. United States v. Pringle*, 751 F.2d 419, 427–28 (1st Cir.1984) (rejecting due process challenge to protection of classified information against discovery).

■ Yunis also objects to the district court's refusal to order the government to produce records of conversations between Flight 402 and the Beirut control tower. After *ex parte, in camera* review of classified materials relevant to Yunis' various discovery requests, the trial court ordered disclosure of numerous documents, including "[a]ll audio or video tapes and/or transcripts of conversations between defendant and all airport authorities covering the period of the alleged hijacking...." Order, *Yunis,* Crim. No. 87–0377 (D.D.C. July 18, 1988), *reproduced in* Appellant's Appendix at Tab 7. Upon the government's motion for reconsideration, however, the court narrowed this disclosure order by excluding materials, including tapes and transcripts of conversations with airport authorities, that "do not help the defendant's cause." Pretrial Memorandum Order No. 6, *Yunis,* Crim. No. 87–0377, 1988 WL 16302 (Sept. 27, 1988), *reproduced in* Appellant's Appendix at Tab 9. Yunis subsequently renewed his request for conversations between Yunis and the Beirut tower, claiming that these transcripts were "vital to understand what outside influence or 'orders' were being transmitted to the hijackers by person(s) not on the plane." *See* Defendant's Reply to Government's Opposition to Defendant's Sixth Motion to Compel Discovery at 5 (filed Feb. 22, 1989), *reproduced in* Appellant's Appendix at Tab 13. Relying on its earlier rulings, the district court denied the request. Pretrial Memorandum Order No. 16, *Yunis,* Crim. No. 87–0377 (Feb. 27, 1989), *reproduced in* Appellant's Appendix at Tab 15. Yunis now appeals from that denial.

■ To prevail on a discovery request for classified information, a defendant must make a threshold showing that the requested material is relevant to his case. *Yunis II,* 867 F.2d at 623. If this "low hurdle" is successfully jumped, the court must determine whether or not the government has asserted a "colorable" claim to privilege. If the government has asserted such a claim, the defendant must show that the information would be helpful to his defense. *Id.* We never have had occasion to adopt a rule to guide trial courts when all these showings are made, and we do not do so here; other circuits, however, have endorsed a balancing approach. *See United States v. Sarkissian,* 841 F.2d 959, 965 (9th Cir.1988); *United States v. Smith,* 780 F.2d 1102, 1110 (4th Cir.1985).

Having ourselves reviewed *in camera* the government's classified submissions to the district court, we find very little in them that is both responsive to the discovery request at issue and relevant in any way to Yunis' trial. We certainly agree with the court below that they reveal no information within the scope of Yunis' discovery request that would have helped him at trial. Moreover, *Yunis II* establishes that the government has at least a colorable interest in avoiding release of information that might reveal "the time, place, and nature of the government's ability to intercept the conversations at all." *Yunis II,* 867 F.2d at 623. Under these circumstances, the district court properly declined to order the government to release classified information responsive to Yunis' discovery request.

### D. *Jury Instructions*

■ Lastly, Yunis challenges the district court's instructions to the jury insofar as they relate to intent requirements of the federal hostage taking, hijacking, and conspiracy statutes and to appellant's affirmative defense of obedience to military orders. In so doing, appellant does not come before an "impregnable citadel[ ] of technicality." *United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (quoting R. Traynor, The Riddle of Harmless Error 14 (1970) (citation omitted)). Trial courts, not the courts of appeals, are the principal bulwarks against injustice in our judicial system, and their resolution of the myriad questions that arise in the course of a criminal trial must be afforded deference. As the Supreme Court has "stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89

L.Ed.2d 674 (1986) (citations omitted). In particular, appellate judges ought not substitute their prejudices regarding jury instructions or their notions of apt phraseology for the experience of trial judges in such matters; our more limited responsibility is to ensure that the law is correctly stated for jurors to apply. Where the indispensable prerequisites for a fair trial have been afforded, we will not overturn a conviction just because an awkward word was used in instructing the jury, or even because we would have sustained a defense objection that was overruled. Instead, we look at the *entire record* of the proceedings below and ignore errors that do not undermine confidence in the conviction when viewed in light of all that took place. *See Rose v. Clark*, 478 U.S. 570, 576–79, 106 S.Ct. 3101, 3105–07, 92 L.Ed.2d 460 (1986); *Hasting*, 461 U.S. at 507–09, 103 S.Ct. at 1979–81; *Chapman v. California*, 386 U.S. 18, 21–24, 87 S.Ct. 824, 826–28, 17 L.Ed.2d 705 (1967); *Kotteakos v. United States*, 328 U.S. 750, 762–65, 66 S.Ct. 1239, 1246–48, 90 L.Ed. 1557 (1946). With these precepts in mind, we now turn to appellant's specific allegations of error in the instructions given by the trial judge.

1. Intent Requirements

Yunis claims that the Antihijacking Act, 49 U.S.C.App. § 1472(n), and the Hostage Taking Act, 18 U.S.C. § 1203, make specific intent an element of the offenses they establish, and that the district court erred in failing to adopt jury instructions offered by the defense that would have made this clear. In appellant's view, the trial judge's instruction that Yunis could be convicted on these counts only if he acted "intentionally, deliberately and knowingly" was inadequate. Transcript of Jury Instructions, March 10, 1989, at 17–18, 20 [hereinafter "Instructions"].

■ 49 U.S.C. App. § 1472(n) suggests no specific intent requirement on its face, criminalizing any "unlawful" hijacking of an aircraft. Nor do judicial interpretations of related statutes support appellant's position. In fact, courts have interpreted a companion provision criminalizing domestic hijacking, 49 U.S.C. App. § 1472(i), as requiring only general criminal intent, even though (unlike section 1472(n)) it specifies that hijackers must act with "wrongful intent." *See United States v. Castaneda-Reyes*, 703 F.2d 522, 525 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 174, 78 L.Ed.2d 157 (1983); *United States v. Busic*, 592 F.2d 13, 21 (2d Cir.1978); *United States v. Bohle*, 445 F.2d 54, 60 (7th Cir. 1971). In light of these decisions, and absent any encouragement from Congress, we decline Yunis' invitation to graft a specific intent requirement onto the Antihijacking Act.

■ Yunis' claim that the Hostage Taking Act requires specific intent also fails. The statutory language suggests no intent requirement other than that the offender must act with the purpose of influencing some third person or government through the hostage taking, a point on which the jury received proper instructions. *See* Instructions at 17 (quoting 18 U.S.C. § 1203(a)). Nor are we aware of any legislative history suggesting that Congress meant to impose a specific intent requirement. Thus, we conclude that the trial judge's instructions on this count of the indictment accorded with law.

■ We find no merit in Yunis' objection (not raised at trial) that the district court failed to instruct the jury that specific intent is a necessary element of the crime of conspiracy. True, "the specific intent required for the crime of conspiracy is in fact the intent to advance or further the unlawful object of the conspiracy." *United States v. Haldeman*, 559 F.2d 31, 112 (D.C.Cir.1976) (footnote omitted), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). But the jury received instructions that the government "must show beyond a reasonable doubt that the conspiracy was knowingly formed and that the defendant willfully participated in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy." Instructions at 10. We discern no defect in this instruction.

■ Yunis further contends that, whatever level of criminal intent was required for these offenses, the district court failed to sufficiently articulate the government's burden of proving that intent. Because this alternative claim was not raised at trial, Yunis must show "plain error." FED. R.CRIM.P. 52. The instructions, however, made it abundantly clear that the government had the burden of proving the requisite intent beyond a reasonable doubt. *See* Instructions at 10 (conspiracy charge), 17–18 (hostage taking), 27 (general instructions on willfulness and burden of proof). There was no error.

### 2. Obedience to Military Orders

The final issues before us concern jury instructions relating to Yunis' affirmative defense of obedience to military orders. Yunis and the government agree on the elements of this common law defense, which are established by several civilian court decisions of rather ancient vintage and by military practice. These precedents generally accord with a formulation approved by the Court of Military Appeals in *United States v. Calley*, 22 C.M.A. 534, 48 C.M.R. 19 (1973):

> The acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him unless the superior's order is one which a man of ordinary sense and understanding would, under the circumstances, know to be unlawful, or if the order in question is actually known to the accused to be unlawful.

*Id.* at 542, 48 C.M.R. at 27 (opinion of Quinn, J.) (emphasis deleted); *see United States v. Clark*, 31 F. 710, 716–17 (C.C.E.D. Mich.1987); *McCall v. McDowell*, 15 F.Cas. 1235, 1240 (C.C.D. Cal.1867) (No. 8,673); *Neu v. McCarthy*, 309 Mass. 17, 33 N.E.2d 570, 573 (1941); U.S. DEP'T OF DEFENSE, MANUAL FOR COURTS-MARTIAL, UNITED STATES, 1984, R.C.M. 916(d) at II–128 ("It is a defense to any offense that the accused was acting pursuant to orders unless the accused knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful.").

Appellant does not disagree with the district court's jury instructions on the general elements of this affirmative defense. Instead, Yunis claims that the district court erred as a matter of law when it instructed the jury that Yunis could prevail on this defense only if the Amal Militia—to which Yunis belonged and which, he claimed, ordered the hijacking—is a "military organization." The court further instructed the jury that it could find that the Amal Militia is a military organization only if the group has a hierarchical command structure and "[c]onducts its operations in accordance with the laws and customs of war," and if its members have a uniform and carry arms openly. Instructions at 34.

■ Yunis disputes the district court's position that members of a legitimate military organization must have a uniform. Since the hijackers wore civilian clothes and there was evidence that members of the Amal Militia often dressed this way, appellant concludes that the instruction was prejudicial to his defense. Yunis argues that the relevance of uniforms to the ultimate factual question of whether or not the Amal Militia is a military organization is itself a factual question for the jury, not a question of law. He notes that U.S. courts have not developed any test for determining whether or not defendants who invoke the obedience defense actually belong to bona fide military organizations. But the government responds that courts have not developed such a test simply because the issue has not arisen in U.S. courts; heretofore, the defense has been raised only by members of the United States armed forces. In the government's view, the district court properly adapted its instructions on the obedience defense when faced with novel factual circumstances.

We agree that the district court did not commit legal error when it looked beyond domestic precedents to give jurors guidance in evaluating the Amal Militia's military credentials. Moreover, we find that the test of a bona fide military organization adopted by the district court reflects inter-

national practice, providing assurance that Yunis did not suffer from parochial projection of American norms onto the issue of whether he should be treated as a soldier for purposes of the obedience defense.

Specifically, the district court's uniform instruction finds sufficient support in international agreements that bear on the question. *See* Geneva Convention Relative to the Treatment of Prisoners of War, *opened for signature* Aug. 12, 1949, art. 4(A)(2), 6 U.S.T. 3317, 3320, T.I.A.S. No. 3364 [hereinafter Geneva Convention]; Hague Convention No. IV Respecting the Law and Customs of War on Land, Oct. 18, 1907, annex § I, ch. I, art. 1, 36 Stat. 2277, 2295–96, T.S. No. 539 [hereinafter Hague Convention No. IV]. The Geneva Convention, signed by 167 nations including the United States and Lebanon, establishes "having a fixed and distinctive signal recognizable at a distance" as one of four necessary conditions that qualify the members of a militia for treatment as prisoners of war. *See* 6 U.S.T. at 3320. The Hague Convention No. IV, to which the United States and forty-two other nations are parties, uses having "a fixed distinctive emblem recognizable at a distance" as a test for whether militiamen and members of volunteer corps have the rights and responsibilities of national armies. *See* 36 Stat. at 2295–96. At oral argument, counsel for appellant disavowed reliance on the district court's substitution of "uniform" for "signal" or "emblem," and we agree that this free interpretation of the treaty language did not prejudice the defense.

 Yunis' second objection to the district court's "military organization" test relates to the instruction, tracking language found in article 4 of the Geneva Convention and chapter I of the annex to the Hague Convention No. IV, that militias must "conduct [their] operations in accordance with the laws and customs of war" to qualify as military organizations. Instructions at 34. Appellant alleges that this instruction must be considered in tandem with the trial judge's statement to the jury that the hijacking of Flight 402 violated international law. Together, he says, these instructions directed the jury to conclude that the defense of obedience to military orders was unavailable to Yunis because no organization could have given the instruction to hijack Flight 402 without violating "the laws and customs of war."

We disagree with appellant's reading of the record, however, and find that when the district court's instructions are considered as a whole, it is highly improbable that a reasonable juror would have understood them to direct a verdict on the affirmative defense. *See United States v. Lemire*, 720 F.2d 1327, 1339 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). In the first place, appellant ignores the trial judge's charge to the jury that it was responsible for determining, based on the evidence, whether or not the Amal Militia is a military organization. Instructions at 34. So too, the court told jurors that if they found that Yunis was a soldier in a military organization under the definition given them, they would then have to address the issue of whether or not Yunis knew that his orders were illegal. *Id.* at 35. Both of these instructions contradict appellant's suggested reading, leading us to conclude that the jury would not have understood the question of whether or not the Amal Militia is a military organization to be foreclosed.

Appellant's interpretation becomes even more attenuated in light of the government's closing argument, during which the prosecution told jurors that they would have to determine whether the Amal Militia is "a military organization that *basically* plays by the rules." Trial Transcript, March 9, 1989, at 106–07 (emphasis added). *See United States v. Park*, 421 U.S. 658, 674–75 & n. 16, 95 S.Ct. 1903, 1912 & n. 16, 44 L.Ed.2d 489 (1975) (jury instructions must be viewed in context of trial as a whole). This statement framed the issue correctly, albeit informally, providing additional assurance that any ambiguity arising from the court's juxtaposition of the illegality instruction and the adherence to international law instruction did not prejudice Yunis' defense. Because the jury instructions, read as a whole and in light of the

evidence and arguments at trial, leave us confident that no prejudicial error occurred, we find that the district court acted within the scope of its discretion.

### III. CONCLUSION

For the foregoing reasons, the convictions are

*Affirmed.*