BROWN, Circuit Judge,
concurring in the denial of rehearing en banc:
Denial is the fate of most requests for en banc review, and almost all requests meet that fate quietly without comment from the court. I would prefer to follow the usual pattern here. But this, it seems, is no usual case. Neither the government’s response to the request for rehearing nor the opinions accompanying *2 the denial can be described as “usual.” Al-Bihani’s petition requests the court take the radical step of incorporating all of international law as judicially enforceable constraints on the President’s war powers. The government responds ambivalently, adopting the questionable strategy of conceding Al-Bihani’s point, but nonetheless urging denial of rehearing. Seven members of this court now vote to deny the petition, but append a cryptic statement that exhibits no apparent function other than to mystify. One judge offers a scholarly exegesis on the unen-forceability of international law norms as limits on the President’s war-making authority under the AUMF. And last, another judge contributes a separate opinion that conceives of a brave new role for judges in wartime: that of supervisors of the battlefield.
These are unusual developments, indeed, and their cumulative effect is to muddy the clear holding of Alr-Bihani that international law as a whole does not limit the AUMF’s grant of war powers. Although we have avoided en banc review, we have done so through the costly expedient of making a rather common-place judicial proposition impenetrably obscure. Clarity in law is a virtue. In the context of war, that virtue becomes a life-and-death necessity. But there appears to be a countervailing motivation behind the court’s resistance to Alr-Bihani’s holding: an intuition about the domestic role of international law, one that moves below the surface of the briefs and opinions of this en banc petition process. Hoping to avoid a resolution that leaves all parties in doubt about international law’s relation to the AUMF, I write separately to pull the veil back on that intuition and provide as much clarity as possible.
The Al-Bihani opinion held as “mistaken” the “premise that the war powers granted by” the AUMF and other statutes “are limited by the international laws of war.” Al-Bihani v. Obama, 590 F.3d 866, 871 (D.C.Cir.2010). This holding disposed of Al-Bihani’s international law-based claims and instead hinged the resolution of his case on “the text of relevant statutes and controlling domestic caselaw.” Id. at 871-72.
Although Al-Bihani’s rehearing petition challenges the panel opinion on numerous points, it is his challenge to this holding that has caused consternation. Seven judges have embraced a peculiar concurrence that strives to make clear that the holding was not necessary to the disposition of the case, providing four citations to that effect. But the concurrence leaves unclear the reason why this uncontroversial point is relevant. We grant rehearing when a panel opinion creates a conflict with Supreme Court or circuit precedent, or when a case presents a question we deem exceptionally important. See Fed. R.App. P. 35(a). Neither of these criteria is affected when an opinion’s disposition is supported by two independently sufficient alternative holdings.
Perhaps the seven-member concurrence is implying that the holding at issue is dictum — a position for which Judge Williams argued explicitly in his separate opinion at the panel stage, see Al-Bihani, 590 F.3d at 885 (Williams, J., concurring). Under this view, the holding would therefore be incapable of either creating a conflict with prior law or presenting an important question. But this notion would be incorrect. It is a longstanding principle that alternative holdings each possess precedential effect. See United States v. Title Ins. & Trust Co., 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110 (1924) (“[W]here there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the *3 ruling on neither is obiter [dictum], but each is the judgment of the court, and of equal validity with the other.”); see also Woods v. Interstate Realty Co., 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949); Commonwealth of Mass. v. United States, 333 U.S. 611, 623, 68 S.Ct. 747, 92 L.Ed. 968 (1948). Therefore, if the majority of this court believes the holding at issue would otherwise satisfy one or both of the en banc rehearing criteria, a grant of rehearing cannot be avoided by labeling the holding as unnecessary. Nor will future litigants be able to avoid the holding’s binding authority by wielding the same label.
Another possible motivation for the concurrence may be a desire to accommodate both the government’s eager concession that international law does in fact limit the AUMF and the government’s argument that its opinion on the matter is entitled to “substantial deference.”[1] Resp. to Petition for Rehearing, at 6-8 & n. 3. But such a motivation would be illegitimate. Contrary to the government’s claim, its preferred statutory interpretation warrants no deference from this court. A “pure question of statutory construction [is] for the courts to decide,” INS v. Cardoza-Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), and doing so — even when a statute concerns foreign affairs — is “well within the province of the Judiciary,” Repub. of Austria v. Altmann, 541 U.S. 677, 701, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). Of course, courts are highly deferential when reviewing challenges to executive actions taken pursuant to a grant of wide discretion “to affect a situation in a foreign territory.” United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 321, 57 S.Ct. 216, 81 L.Ed. 255 (1936). We will refrain from requiring “narrowly definite standards by which the President is to be governed” and will not lightly endeavor to “limit[] or embarrass[] such powers.” Id. at 322, 57 S.Ct. 216.[2] However, even when courts consider the Executive’s historic practice to inform the interpretation of a statute, they are not imbuing the President with judicial power.
I sense, then, something more significant than a narrow concern over dictum or deference at work in the seven-member concurrence. There is in the scholarly community an intuition that domestic statutes do not stand on their own authority, but rather rest against the backdrop of international norms. This intuition has taken many argumentative forms, some more emphatic than others. For instance, there are those scholars who believe domestic statutes are merely suggestive wordings to which courts can and should append international legal norms, regardless of congressional intent.[3] Others are more shy, imparting to Congress a general *4 intent to legislate in conformity with international law and therefore reasoning that all statutes, unless containing a clear statement otherwise, should be read by courts to incorporate international legal norms.[4] However this intuition is phrased, perhaps the majority of judges on this court are apprehensive about unambiguously rejecting it. So, even though the panel decision foreclosed the idea, the short concurrence may represent a wish to leave open a possibility — however slight — that domestic statutes are in fact subordinate to an overarching international legal order.
If that is their wish, it is a curious one. The idea that international norms hang over domestic law as a corrective force to be implemented by courts is not only alien to our caselaw, but an aggrandizement of the judicial role beyond the Constitution’s conception of the separation of powers. See United States v. Yunis, 924 F.2d 1086, 1091 (D.C.Cir.1991) (“[T]he role of judges ... is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law.”). That aggrandizement is clear in the more extreme scholarly opinions calling for courts to ignore congressional intent in favor of international norms. And it is only slightly better disguised in the superficially restrained claims that Congress intends to conform its actions with global ideals, and that a clear statement is required if courts are to be prevented from reading international law into statutory text. Traditional clear statement rules are justified on the basis of preserving statutes against possible nullification by a constitutional value, keeping both Congress and the judiciary within their constitutional capacities.[5] However, a demand that Congress clearly enunciate the inapplicability of international norms is not premised on any constitutional value; nothing in the Constitution compels the domestic incorporation of international law. Instead, what such a demand protects is a policy preference, imputing to Congress a general posture toward international restrictions and erecting the highest interpretive hurdle to the legitimate prerogative of Congress to legislate apart from them. This is a restrained search for legislative “intent” only in the most Orwellian sense — one that grants judges license to usurp the legislative role and dictate to Congress what it is supposed to think. Surprisingly, proponents of this idea actually claim it guards the separation of powers. See Wuerth, supra, at 349-50. But if that is the case, then the cure is truly worse than the disease.
I see much of this scholarly idea in Judge Williams’ separate opinion. While purporting to share Judge Kavanaugh’s concern about using “gauzy notions of international law to rein in the executive’s conduct of military operations,” infra, at 56 (opinion of Williams, J.), Judge Williams offers a hazy but ominous hermeneutics. Its animating premise is that Boumediene *5 v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), used the Suspension Clause to create an opening through which the Judiciary now — as a constitutional matter — “monitor[s]” and “supervise^] the battlefield conduct of the U.S. military.” Infra, at 12-13 (opinion of Williams, J.). In executing this supervisory role, the Judiciary should suxrvey the spectrum of “international discourse,” picking and choosing those propositions that exhibit — by the Judiciary’s lights — “serious reasoning,” “consistent ] and evenhanded[] application],” and “practicality]” to the point where they are suitable to control the President’s conduct of war. Id. at 10, 12-13. Judge Williams states these propositions matter-of-factly, even blithely, as routine matters of statutory interpretation. But that nonchalance is only a mask for what is, at its core, a radical and sweeping claim, one at odds with our Constitution and caselaw.
The Constitution entrusts the President — not the Judiciary — with the conduct of war. “The Framers ... did not make the judiciary the overseer of our government,” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring), so Boumediene cannot be read — as Judge Williams suggests — to override that basic notion and hand courts authority to deem international norms as binding commands on the Commander-in-Chief. Such a reading would be in tension with the Supreme Coxxrt’s recognition that courts are “hardly ... competent” in the realm of foreign affairs, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 410, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), and with the constitutional principle that prohibits even Congress, let alone the Judiciary, from “interfering] with the [Executive’s] command of forces and the conduct of campaigns,” Ex Parte Milligan, 71 U.S. (4 Wall.) 2, 139, 18 L.Ed. 281 (1866) (Chase, C.J., concurring).
Further, Judge Williams’ proposed role for the Judiciary goes far beyond the role the Supreme Court envisioned in Hamdi v. Rumsfeld and Boumediene. The Ham-di plurality forecast a restrained process that “meddles little, if at all, in the strategy or conduct of war, inquiring only into the appropriateness of continuing to detain an individual claimed to have taken up arms against the United States.” 542 U.S. 507, 535, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). It seems farfetched that “inquiring only into the appropriateness” of detention should be freighted with the awesome power of deciding which international constraints to enforce against the President. In a similar vein, the Court in Boumediene was circumspect about crafting any substantive rules to control the President’s war powers, repeating that it was not addressing the “content of the law that governs petitioners’ detention,” leaving it to the political branches first to engage in a “debate about how best to preserve Constitutional values while protecting the Nation from terrorism.” 128 S.Ct. at 2277. Boumediene’s holding concerned the jxirisdietion of U.S. coxxrts over Guantanamo habeas petitions, and it strains the jurisdictional nature of that holding to draw from it a substantive judicial power to spin international discourse into binding domestic law. It is no wonder then that Judge Williams does not offer any language from Boumediene to support his theory of an expanded judicial role in military affairs.
This sprint into judicial immodesty cannot be redeemed by Judge Williams’ argument that international law parallels traditional tools of statutory interpretation, and that by turning to it for substantive meaning eoxirts are only divining the intent of Congress. I am unaware of any federal judicial opinion — and Judge Williams cites none — that has ever before characterized *6 international discourse as a traditional tool of statutory interpretation on par with legislative history, usage in other domestic statutes and cases, or dictionary definitions. The varied process by which international law is made — through treaty, tribunal decision, and the constant churn of state practice and opinio juris — shares few, if any, of the qualities that give the traditional sources of interpretation their authority. Courts turn to legislative history because it comes from the mouths of legislators and therefore arguably sheds light on their intentions and understandings. Courts examine the usage of terms in other statutes and judicial decisions because our law is a closed and coherent system that strives for internal consistency. And courts consult dictionaries for the same reason most people do: our law, like the rest of our society, is dependent on language’s technical meaning among American English speakers. On none of these grounds can the use of international law be justified.
As Judge Kavanaugh explains in his detailed concurrence, international norms outside of those explicitly incorporated into our domestic law by the political branches are not part of the fabric of the law enforceable by federal courts after Erie. See infra, at 16-19 (Kavanaugh, J., concurring in denial of en banc rehearing). They therefore do not help courts to determine congressional intent or to recognize the wider coherence of the law. And international discourse, unlike a dictionary, is anything but a source of specific, technical, and shared linguistic meaning. Judge Williams concedes this point, characterizing international law as often “vague and deficient,” consisting of “gauzy notions” that are prone to “misuse” by nations for “political purpose[s],” and subject to official criticism by our elected representatives. Infra, at 12-13 (opinion of Williams, J.). How can sifting through such an unstable and unreliable trove of meaning be likened to opening a dictionary? How is it advisable or legitimate for courts to take on such a treacherous task, especially when the political branches possess the competency and traditional duty to do the sifting themselves by domestically incorporating international law through statute or rendering treaties self-executing?
But suppose we ignore the questionable propriety of Judge Williams’ interpretive method and endeavor to apply it in this case. Ironically — and perhaps paradoxically — we likely would double-back to the same conclusion that international law does not limit the AUMF. The phrase in the AUMF on which Al-Bihani hinges his argument is “necessary and appropriate,” which he contends modifies the word “force” by prohibiting conduct not approved by international law. The closest analogy in domestic law is the phrase “necessary and proper,” which, as Judge Kava-naugh notes in his concurrence, has in its constitutional and statutory provenance been consistently interpreted to broaden rather than to constrain discretion. See, e.g., Legal Tender Cases, 79 U.S. (12 Wall.) 457, 550, 20 L.Ed. 287 (1870) (“[T]he auxiliary powers, those necessary and appropriate to the execution of other powers singly described ... are grouped in the last clause of section eight of the first article [the Necessary and Proper Clause].”) (emphasis added). Turning to international materials does not yield a different meaning. Usage of the phrase “necessary and appropriate” on the international plane grants nations wide discretion to act and does not purport to constrain them with international law. One example — among many — is U.N. Security Council Resolution 1624, which in three separate clauses calls upon states “to take all measures as may be necessary and appropriate and in accordance with their *7 obligations under international law” to counter incitement to terrorist acts. S.C. Res. 1624, ¶¶ 1, 3, U.N. Doc. S/RES/1624 (Sept. 14, 2005) (emphasis added); see also id. pmbl. That the Security Council felt the need to append international law obligations to “necessary and appropriate”— three times, no less — indicates the phrase does not automatically incorporate such obligations.
But putting aside the preceding discussion (and the odd conceptual loop it creates), I reiterate that consulting international sources in that manner is not something judges have in their interpretive toolbox. The only generally applicable role for international law in statutory interpretation is the modest one afforded by the Charming Betsy canon, which counsels courts, where fairly possible, to construe ambiguous statutes so as not to conflict with international law. See Restatement (Third) of the Foreign Relations Law of the United States § 114 (1987); see also Sampson v. Fed. Repub. of Germany, 250 F.3d 1145, 1152 (7th Cir.2001).[6] However, Judge Williams does not appear to confine international law to such a narrow space. By including international discourse among the traditional tools available to courts when interpreting statutes, Judge Williams is not limiting the application of international law to ambiguous statutory text. Generally, a statute’s text is only ambiguous if, after “employing traditional tools of statutory construction,” a court determines that Congress did not have a precise intention on the question at issue. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It is at this point — analogous to Chevron Step Two — that the Charming Betsy canon has had any application in federal courts. But Judge Williams implies that international law should be consulted in the first instance to influence interpretation at the same level as traditional interpretive tools, making its use predicate to a finding of ambiguity. This implication has the secondary effect of eviscerating the limiting principle of the Charming Betsy canon that it only exerts a negative force on the meaning of statutes, pushing them away from meanings that would conflict with international law. Courts do not apply Charming Betsy as an affirmative indicator of statutory meaning. See, e.g., Sampson, 250 F.3d at 1152-53 (holding the Charming Betsy canon does not require “federal statutes [to be] read to reflect norms of international law”); Princz v. Fed. Repub. of Germany, 26 F.3d 1166, 1174 & n. 1 (D.C.Cir.1994) (rejecting dissent’s argument that statutes must be read “consistently with international law” and must be presumed to “incorporate[ ] standards recognized under international law,” Princz, 26 F.3d at 1183 (Wald, J., dissenting)). However, under Judge Williams’ method, I see no reason why courts would be bound by this rule, since traditional interpretive sources are nor *8 mally viewed as indicative of affirmative meaning. These inconsistencies with the Charming Betsy canon make clear that Judge Williams’ proposal cannot possibly be correct. If it were, it would be a mystery why American jurisprudence would even bother to enunciate an interpretive canon like the Charming Betsy. Judge Williams’ approach would make that canon vestigial, foolish even — akin to a canon limiting the use of dictionaries.
Most troubling of all is the grotesque non sequitur that Congress must have intended to incorporate international law through the AUMF because it would be odd to think Congress “embrace[d]” a long history of wartime atrocity, from the Rape of Nanking to the massacre at Lidice. Judge Williams may believe that the only barrier that would hold back our nation from a descent into Nazism is an enlightened judiciary standing at the precipice, wielding international norms our polity is presumably unable to muster from within.[7] But that belief cannot change the plain text of the AUMF, its legislative history, or the longstanding congressional practice of granting “the President a degree of discretion and freedom from statutory restriction” necessary to carry out his foreign affairs duties, Cmtiss-Wright, 299 U.S. at 320, 57 S.Ct. 216.
There is no indication that the AUMF placed any international legal limits on the President’s discretion to prosecute the war and, in light of the challenge our nation faced after September 11, 2001, that makes eminent sense. Confronted with a shadowy, non-traditional foe that sueceed-ed in bringing a war to our doorstep by asymmetric means, it was (and still is) unclear how international law applies in all respects to this new context. The prospect is very real that some tradeoffs traditionally struck by the laws of war no longer make sense. That Congress wished the President to retain the discretion to recalibrate the military’s strategy and tactics in light of circumstances not contemplated by our international obligations is therefore sensible, and reflects the traditional sovereign prerogative to violate international law or terminate international.agreements. See Garcia-Mir v. Meese, 788 F.2d 1446, 1455 (11th Cir.1986) (“[T]he power of the President to disregard international law in service of domestic needs is reaffirmed.”); Restatement (Third) of the Foreign Relations Law of the United States § 339 (describing power of the President to suspend or terminate international agreements).[8]
The only way a court could reach the opposite conclusion is to go beyond the AUMF’s text, freeing it — as Judge Williams suggests — to appeal to an international meta-narrative, one activated whenever a legal issue touches on matters that strike the judge as transnational in flavor. Judges act prudently when they consciously forego opportunities for policy-making. Therefore, ignoring the text and plain meaning of a statute to privilege a more creative interpretation is the antithesis of prudence. And, in a time of war, it has the inconvenient effect of upending more than a century of our jurisprudence based on an understanding as old as the *9 Republic: that the “conduct of foreign relations of our government is committed by the Constitution to the executive and legislative ... departments,” not to the judiciary. Oetjen v. Cent. Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918).
The only proper judicial role in this case is the truly modest route taken by the panel opinion in Al-Bihani. We read “necessary and appropriate” in its traditional sense, taking Congress at its word that the President is to have wide discretion. This is a modest course because the President retains the leeway to implement his authority as broadly or narrowly as he believes appropriate — consistent with international law or not — and the legislature, in turn, may add whatever limits or constraints it deems wise as the war progresses. This ensures that wartime decisions will be informed by the expertise of the political branches, stated in a clear fashion, and that the decisionmakers will be accountable to the electorate.
None of those benefits accrue if the conduct of the military is subject to judicial correction based on norms of international discourse. Such an approach would place ultimate control of the war in the one branch insulated from both the battlefield and the ballot box. That would add further illegitimacy to the unpredictable and ad hoc rules judges would draw from the primordial stew of treaties, state practice, tribunal decisions, scholarly opinion, and foreign law that swirls beyond our borders. It is no comfort to the military to say, as Judge Williams does, that courts will only apply international rules they deem to possess the qualities of serious reason, evenhandedness, and practicality. Those are not judicially manageable standards. Those are buzzwords, the pleasing sound of which nearly lulls the mind into missing the vision of judicial supremacy at the heart of Judge Williams’ opinion.

. Judge Kavanaugh reads this part of the government's brief differently than I do, seeing it as a conflicted argument that leaves doubt over whether the government truly means what it says. See infra, at 46-47 (Kavanaugh, J., concurring in denial of en banc rehearing). I agree the government's brief is conflicted as a general matter, but on this point I believe its claim to deference is clear.

. This was, in fact, precisely the sort of deference the government received in the panel decision.

.See, e.g., Jeremy Waldron, Foreign Law and the Modern Ius Gentium, 119 Harv. L.Rev. 129, 144 (2005) (proposing courts resort to norms located in a universal “ius gentium " to treat "problems that arise in our courts as though they were questions of legal science”); Jonathan Turley, Dualistic Values in the Age of International Legisprudence, 44 Hastings L.J. 185, 265, 271 (1993) (advocating courts shift "the emphasis away from determining congressional intent toward upholding international principles” and "serve a central political function in the developing transnational arena”).

. See, e.g,, Ingrid Brunk Wuerth, Authorizations for the Use of Force, International Law, and the Charming Betsy Canon, 46 B.C. L.Rev. 293, 334-36, 357 (2005); Ralph G. Steinhardt, The Role of International Law as a Canon of Domestic Statutory Construction, 43 Vand. L.Rev. 1103, 1112, 1115 (1990) (positing a “presumption that Congress intends to conform its statutes to international standards” in the "absence of a clear statement of repudiation by Congress”).

. See William N. Eskridge, Jr. & Philip P. Frickey, Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking, 45 Vand. L.Rev. 593, 599-609 (1992) (discussing the constitutional concerns behind canons such as the constitutional avoidance canon, the rule of lenity, and the presumption in favor of judicial review).

. I note the Charming Betsy canon was not invoked in the panel opinion because it is not applicable to this case. First, the relevant text of the AUMF is not ambiguous. The phrase “necessary and appropriate” is broad, but wide breadth is not tantamount to ambiguity, particularly when a phrase has a stable interpretive pedigree. Second, even if the phrase were ambiguous, the canon only applies to statutory interpretations that would violate international law. An interpretation declining to place international legal constraints on the President does not, by itself, place the United States in violation of international law. It merely affirms the President’s normal prerogative to observe or abrogate international obligations. Judge Kavanaugh also details other persuasive reasons why Charming Betsy does not apply in this case. See infra, at 31-42 (Kavanaugh, J., concurring in the denial of en banc rehearing).

. Our nation has in fact established workable norms forbidding such crimes against humanity, as detailed by Judge Kavanaugh. See infra, at 12-13, 28-31 (Kavanaugh, J., concurring in denial of en banc rehearing).

. That courts cannot enforce non-self-executing or non-incorporated international law against the President does not imply the United States would escape consequences of breach on the international plane. Whether to incur such consequences is part of the political calculus the President performs when deciding to disregard international obligations.