**UNITED STATES of America, Appellee,**

v.

**Omar Mohammed Ali REZAQ, a/k/a Omar Marzouki, a/k/a Omar Amr, Appellant.**

**No. 96–3127.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1997.

Decided Feb. 6, 1998.

Robert L. Tucker, Assistant Federal Public Defender, argued the cause for appellant, with whom A.J. Kramer, Federal Public Defender, Washington, DC, was on the briefs.

John F. De Pue, Attorney, United States Department of Justice, Washington, DC, argued the cause for appellee, with whom Mary Lou Leary, United States Attorney, Joseph B. Valder, Assistant United States Attorney, and Scott J. Glick, Attorney, United States Department of Justice, Washington, DC, were on the brief.

Before: WALD, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Omar Mohammed Ali Rezaq appeals his conviction on one count of aircraft piracy under 49 U.S.C. app. § 1472(n) (1994). In 1985, Rezaq hijacked an Air Egypt flight shortly after takeoff from Athens, and ordered it to fly to Malta. On arrival, Rezaq shot a number of passengers, killing two of them, before he was apprehended. Rezaq pleaded guilty to murder charges in Malta, served seven years in prison, and was released in February 1993. Shortly afterwards, he was taken into custody in Nigeria by United States authorities and brought to the United States for trial.

Rezaq raises seven issues on this appeal. He argues: (1) that the district court erred in permitting him to be prosecuted at all, as the air piracy statute under which he was prosecuted bars sequential prosecutions, and he had already been prosecuted in Malta; (2) that the air piracy statute bars the prosecution of defendants forcibly brought to the United States for the purpose of prosecution; (3) that the district court erred in applying a provision of the air piracy statute requiring that defendants receive life imprisonment (or the death penalty) if "death results" from their acts, as this provision only applies if certain additional jurisdictional requirements are satisfied; (4) that his trial was fatally tainted by the introduction of evidence relating to the passengers' deaths, and that this evidence should have been presented in a separate phase of the trial or, in the alternative, that it should have been presented in a less grisly form; (5) that publicity toward the end of his trial resulting from the crash of another airplane improperly affected the jury's deliberations; (6) that the district court erred in assessing the restitution he was to pay to his victims as part of his sentence; and (7) that the district court may have erred in its orders relating to the disclosure of classified government documents to the defense. We find none of Rezaq's arguments persuasive, and thus affirm his conviction and sentence in their entirety.

## I. BACKGROUND

Rezaq did not deny committing the hijacking at trial, relying instead on the defenses of insanity and obedience to military orders. Thus, the following account of the hijacking was not contested at Rezaq's trial.

Rezaq is Palestinian, and was, at the time of the hijacking, a member of a Palestinian terrorist organization, which planned and ordered the hijacking. On the evening of November 23, 1985, Rezaq boarded Air Egypt Flight 648 in Athens. He was accompanied by two other hijackers; one of his confederates, named Salem, was the leader of the operation, and the name of the other is unknown. Shortly after the plane took off, the three produced weapons, announced that they were seizing the plane, and demanded that the captain fly it to Malta. A gun battle ensued between the hijackers and an Egyptian plainclothes sky marshal stationed on the plane, as a result of which Salem was killed and the sky marshal was wounded.

Rezaq then took charge of the hijacking. After the plane arrived in Malta, he separated the Israeli and American passengers from the others, and moved them to the front of the plane. He released a number of Egyptian and Filipino female passengers, as well as two wounded flight attendants. He then demanded that the aircraft be refueled; when the authorities refused, he announced that he would shoot a passenger every fifteen minutes until his demand was met.

Rezaq carried out his threat. He first shot Israeli national Tamar Artzi. Although he shot her twice, once in the head, she survived. Fifteen minutes later, he shot her companion, Nitzan Mendelson, also an Israeli; Ms. Mendelson died of her injuries nine days later. Rezaq then shot Patrick Baker, an American, but only succeeded in grazing his head. Two or three hours later, Rezaq shot Scarlett Rogenkamp—a United States citizen and an employee of the United States Air Force—in the head, killing her. Some time later, he shot Jackie Pflug, also an American, in the head, injuring her very seriously. Rezaq shot his victims near the front door of the plane, and either threw them or let them fall onto the tarmac; this may explain why three of the five were able to survive, either by escaping (Artzi and Baker), or by feigning death (Pflug).

In the evening of November 24th—about a day after the hijacking began—Egyptian commandos stormed the plane. The operation seems to have been a singularly incompetent one. The commandos fired indiscriminately, and set off an explosive device of some kind, as a result of which the aircraft burst into flames. Fifty-seven passengers were killed, as was the third hijacker. Rezaq was injured, and was taken, with a multitude of injured passengers, to a hospital. There, he was identified as the hijacker by passengers, members of the crew, and several of his victims.

The authorities in Malta charged Rezaq with murder, attempted murder, and hostage taking. He pled guilty, and was sentenced to 25 years' imprisonment. For reasons unclear, Maltese authorities released him some seven years later, in February 1993, and allowed him to board a plane to Ghana. Rezaq's itinerary was to carry him from there to Nigeria, and then to Ethiopia, and finally to Sudan. Ghanaian officials detained Rezaq for several months, but eventually allowed him to proceed to Nigeria. When Rezaq's plane landed in Nigeria, Nigerian authorities placed him in the custody of FBI agents, who transported him on a waiting aircraft to the United States.

Rezaq was indicted and tried for air piracy in the District Court for the District of Columbia. At trial, Rezaq invoked the defenses of insanity and obedience to military orders. In support of his insanity defense, Rezaq presented evidence that he suffered from post-traumatic stress disorder ("PTSD"). As witnesses, he called several members of his own family and three psychiatric experts; Rezaq himself also testified at length. Rezaq asserted that his PTSD sprang from numerous traumatic events he had experienced, first in the Jordanian refugee camp in which he spent much of his youth, and later in Lebanon, where he was active in Palestinian revolutionary organizations from 1978 to 1985. The Lebanese experiences he described included witnessing the killing of hundreds of refugees by Israeli forces in Beirut in 1982; witnessing the killings of the populations of entire villages; and nearly being killed in a car bombing. Rezaq's family testified that when he left Jordan he was normal, friendly, and extroverted, but that when he returned from Lebanon he was pale, inattentive, prone to nightmares, antisocial,

and had lost his sense of humor. Rezaq's psychiatric experts said that these changes in behavior were symptomatic of PTSD, and, based on their examination of Rezaq and on the testimony of other witnesses, they concluded that Rezaq was suffering from PTSD when he committed the hijacking in November 1985. The United States presented two psychiatric experts of its own, who testified that Rezaq's symptoms were not as intense as those usually associated with PTSD, and that Rezaq was able to reason and make judgments normally at the time he hijacked the plane.

The jury did not credit Rezaq's defenses, and found him guilty of the one count with which he was charged, aircraft piracy in violation of 49 U.S.C. app. § 1472(n) (1994). At the time of Rezaq's prosecution, that section provided (it has since been amended):

> (1) Whoever aboard an aircraft in flight outside the special aircraft jurisdiction of the United States commits an "offense," as defined in the Convention for the Suppression of Unlawful Seizure of Aircraft, and is afterward found in the United States shall be punished—
>
> (A) by imprisonment for not less than 20 years; or
>
> (B) if the death of another person results from the commission or attempted commission of the offense, by death or by imprisonment for life.
>
> (2) A person commits 'an offense,' as defined in the Convention for the Suppression of Unlawful Seizure of Aircraft, when, while aboard an aircraft in flight, he—
>
> (A) unlawfully, by force or threat thereof, or by any other form of intimidation, seizes, or exercises control of, that aircraft, or attempts to perform any such act; or
>
> (B) is an accomplice of a person who performs or attempts to perform any such act.

49 U.S.C.App. § 1472(n) (1994). Because death resulted from Rezaq's commission of the offense, § 1472(n)(1)(B) applied, and the district court sentenced Rezaq to life imprisonment. (The United States had not sought the death sentence.) The district court also ordered Rezaq to pay a total of $254,000 in restitution, an amount which it found to represent the financial cost to the victims of his crime.

Rezaq's first group of arguments on this appeal all derive from the international nature of the crime of air piracy. He argues, first, that the international treaty barring air piracy prohibits sequential prosecutions for the same offense, and that it was therefore impermissible for the United States to try him anew for crimes for which he had already been prosecuted in Malta. Second, he asserts that the United States manufactured jurisdiction over him by bringing him into its territory, and that section 1472(n)'s statement that it applies to those "found in the United States" bars the application of section 1472(n) to those forcibly brought to the United States specifically for trial on air piracy charges. Third, Rezaq avers that it was improper for the district court to apply section 1472(n)'s "death results" provision (that is, its provision requiring the imposition of the death sentence or of life imprisonment in cases in which death results), as that provision was only intended to apply if certain jurisdictional criteria were met.

Rezaq's next group of arguments relates to the conduct of his trial. The United States presented a range of evidence at Rezaq's trial relating to the deaths of the passengers shot by Rezaq, including photographs of the autopsy of one of them, Scarlett Rogenkamp. Rezaq argues, first, that the district court should have struck references to these deaths from the indictment; second, that the district court should have bifurcated his trial into one phase addressing the hijacking, and a second addressing the resulting deaths; third, that the district court erred in not compelling the United States to stipulate that the deaths had occurred; and fourth, that the district court erred in allowing the United States to introduce the autopsy evidence. Rezaq also argues that the district court should not have allowed the jury to learn that 57 passengers died when the Egyptian commandos stormed the plane. His last argument in this category claims that the district court should have declared a mistrial when, shortly before the jury began its deliberations, TWA Flight 800 crashed

under mysterious circumstances, fueling speculation about terrorist involvement.

Next, Rezaq argues that the district court erred in the manner in which it calculated the amount of his restitution, both in failing to consider his ability to pay, and in failing to demand more detailed proof of the amount of the victims' losses. Finally, the proceedings in the district court included a number of *ex parte* hearings and orders relating to the United States's obligations to produce classified materials to Rezaq. The district court ruled that the United States could, in lieu of producing certain relevant classified documents, produce admissions of fact that summarized the relevant contents of these documents. Rezaq notes that he cannot examine the originals of these documents, and asks that we ensure that the admissions were an adequate substitute for the documents they replaced.

## II. ANALYSIS

### A. *Sequential Prosecution*

■■■ We begin with Rezaq's argument that it was impermissible for the United States to try him a second time, as he had already been tried in Malta. Rezaq cannot base this argument on the Constitution's Double Jeopardy Clause, for two reasons. First, that clause does not prohibit sequential trials by different sovereigns. *See United States v. Wheeler*, 435 U.S. 313, 317, 98 S.Ct. 1079, 1082–83, 55 L.Ed.2d 303 (1978) (sequential prosecution in Indian tribal court and in federal court is not barred by the Double Jeopardy Clause); *United States v. Richardson*, 580 F.2d 946, 947 (9th Cir.1978) (per curiam) (applying this holding to sequential prosecutions in Guatemalan and United States courts). Second, Rezaq was prosecuted in Malta for murder, attempted murder, and hostage-taking, but the United States prosecution was for air piracy. The offense of air piracy contains elements—related to the control of an airplane—that the crimes for which Rezaq was tried in Malta do not. This means, under the usual double jeopardy analysis, that the first prosecution

does not bar the second. *See United States v. Dixon*, 509 U.S. 688, 696, 703–12, 113 S.Ct. 2849, 2859–64, 125 L.Ed.2d 556 (1993); *see also United States v. Rezaq*, 899 F.Supp. 697, 703–04 (D.D.C.1995) (conducting a detailed comparison of the elements of air piracy with those of the Maltese offenses).

■■■ Rezaq asserts, however, that this case is subject to a more exacting standard than the traditional double-jeopardy one. Section 1472(n), 49 U.S.C. app. § 1472(n) (1994), was enacted to implement the Convention for the Suppression of Unlawful Seizure of Aircraft (also called the "Hague Convention"), Dec. 16, 1970, 22 U.S.T. 1643, a multilateral treaty directed at preventing and punishing air piracy. *See United States v. Yunis*, 924 F.2d 1086, 1092 (D.C.Cir.1991). Rezaq claims that both the Hague Convention and section 1472(n) incorporate a special ban on sequential prosecution that is more restrictive than the Double Jeopardy Clause, and argues that his prosecution on air piracy charges violates that ban.

It is certainly possible that a treaty could contain a double jeopardy provision more restrictive—that is, barring more prosecutions—than the Constitution's Double Jeopardy Clause. In *Sindona v. Grant*, 619 F.2d 167, 178 (2d Cir.1980), for instance, the court so read a double jeopardy provision in an extradition treaty with Italy. *See also United States v. Jurado–Rodriguez*, 907 F.Supp. 568, 577 (E.D.N.Y.1995). But Rezaq has not shown that the Hague Convention falls in this category.[1]

Rezaq points to the provisions of the Hague Convention that require states to either extradite or prosecute offenders, and argues that they imply that a more restrictive double jeopardy rule applies. For instance, he cites Article 4(2), which provides: "Each Contracting State shall likewise take such measures as may be necessary to establish its jurisdiction over the offence in the case where the alleged offender is present in its territory and it does not extradite him pursuant to Article 8...." Rezaq argues

---

1. We also note that Malta was not a party to the Hague Convention at the time of the hijacking. Because we do not agree with Rezaq's claim that the Hague Convention incorporates special restrictions on sequential prosecutions, we need not address the implications of this fact.

that this provision implies that extradition and prosecution are mutually exclusive options: a Contracting Party may not both extradite an offender *and* prosecute him. This rule, he asserts, in turn implies that the Hague Convention intended to bar all sequential prosecutions, whether they occur after extradition or not.

The first step in Rezaq's argument is flawed: the Hague Convention's requirement that a state either prosecute offenders or extradite them does not imply a bar on (at different times) doing both. In general, a requirement to "do A or B" does not necessarily imply a bar on doing both A *and* B; one must look at the context and the purpose of the requirement to decide whether such a bar is meant. For example, if a religious organization requires that its members either do volunteer work or make cash contributions to charity, the organization clearly does not mean to foreclose them from doing both. The purpose of this hypothetical religious mandate is to ensure that believers try to do good deeds, and this purpose is served if a believer chooses to both do volunteer work and make charitable contributions. *Cf. Foutz v. United States*, 72 F.3d 802, 805 (10th Cir.1995) (concluding, based on context, that a set of alternatives in a tax statute should not be read to be mutually exclusive); Phillip M. Kannan, *Symbolic Logic in Judicial Interpretation*, 27 U. MEM. L.REV. 85, 94 (1996).

Here, the context makes clear that the statute's injunction to extradite or prosecute is not meant to state mutually exclusive alternatives. The extradite-or-prosecute requirement is intended to ensure that states make some effort to bring hijackers to justice, either through prosecution or extradition. There is no indication that Article 4 is intended to go beyond setting a minimum, and limit the options of states; indeed, Article 4(3) specifically provides that "[t]his Convention does not exclude any jurisdiction exercised in accordance with national law." A reading of Article 4 that focuses on bringing hijackers to justice is also consistent with the Convention's (short) preamble, one clause of which states that "for the purpose of deterring [acts of air piracy], there is an urgent need to provide appropriate measures for punishment of offenders." Thus, the extradite-or-prosecute requirement is like the hypothetical donate-or-volunteer requirement described above; it is intended to ensure a minimum level of effort, and does not necessarily preclude the recipient of the mandate from doing more.

A reading under which the options of prosecution and extradition are mutually exclusive could also undermine the Convention's goal of ensuring "punishment of offenders." For instance, if a person is extradited from state A to state B, and B then discovers that a technical obstacle prevents it from prosecuting her, B should be able to return her to A for prosecution; any other reading of the treaty might allow a suspect to escape prosecution altogether. Or, to choose an example closer to the facts of this case, if state A tries and convicts a defendant for certain crimes associated with a hijacking (as Malta tried Rezaq for murder, attempted murder, and hostage-taking), there is no indication that A is barred from then extraditing her to B once she has served her sentence, so that B may try the defendant for different crimes associated with the same hijacking (as the United States tried Rezaq for air piracy).[2]

The *travaux préparatoires* for the Hague Convention reinforce our conclusion that the treaty does not incorporate a special bar on

---

**2.** Rezaq, of course, was not extradited at all. Thus, to prevail on this point, he would need to show *both* that options of extradition and prosecution are mutually exclusive, and that this bar extends to all successive prosecutions, whether or not a state actually obtains custody of a defendant *through extradition*. Because Rezaq cannot make out the first half of this argument, we need not address the second.

A different argument might have more persuasive force. Article 4(2) of the Hague Convention requires each state to "establish its jurisdiction<sup>*</sup>

over the offence in the case where the *alleged offender* is present in its territory and it does not extradite him pursuant to Article 8" (emphasis added). A person who has already been tried, convicted, and punished for hijacking may no longer qualify as an "alleged offender," and so may not be subject to a second prosecution for the same crime. Rezaq would have some difficulty making this argument, however, as his trial in Malta was not for hijacking. As he did not make this argument, we will not address it further.

sequential prosecution. They show that the treaty's negotiators considered and rejected the possibility of expressly barring sequential prosecutions through a *ne bis in idem* provision (a term for double-jeopardy provisions in international instruments; another term is *non bis in idem*). The states opposed to this idea, whose views carried the day, argued that "the principle was not applied in exactly the same manner in all States," and that "[i]n taking a decision whether to prosecute, and, similarly, a decision whether to extradite, the State concerned will, in each case, apply its own rule on the subject of *ne bis in idem.*" INTERNATIONAL CIVIL AVIATION ORGANIZATION, LEGAL COMMITTEE, 17th Sess., Doc. 8877–LC/161, at 8 (1970). This is, of course, exactly what the United States has done in applying its own double jeopardy rules.

Nor is there any indication that Congress, in enacting section 1472(n), read the Hague Convention differently, or intended to subject prosecutions under section 1472(n) to a heightened double jeopardy standard. The text and legislative history of section 1472(n) are both devoid of evidence pointing to such a conclusion. In the absence of any sign that either section 1472(n) or the Hague Convention undertook to impose a more stringent than usual double-jeopardy rule, we conclude that Rezaq's prosecution in Malta was not an obstacle to his subsequent prosecution, in this proceeding, on air piracy charges.

### B. *Manufactured Jurisdiction*

■ Rezaq's next argument is that section 1472(n) only applies to defendants that are "afterward found in the United States," and that he was not "afterward found in the United States," but involuntarily brought here for the express purpose of prosecution.

■ Under a rule known as the *Ker–Frisbie* doctrine, "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction'." *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952) (quoting *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886)). This general rule does admit of some exceptions; for instance, an extradition treaty may provide that it is "the only way by which one country may gain custody of a national of the other country for the purposes of prosecution," *United States v. Alvarez–Machain,* 504 U.S. 655, 664, 112 S.Ct. 2188, 2194, 119 L.Ed.2d 441 (1992), and we have also suggested that there may be a "very limited" exception for certain cases of "'torture, brutality, and similar outrageous conduct.'" *Yunis,* 924 F.2d at 1092–93 (quoting *United States ex rel. Lujan v. Gengler,* 510 F.2d 62, 65 (2d Cir.1975)).

Rezaq's argument is, in effect, that the phrase "afterward found in the United States" appearing in section 1472(n) creates a statutory exception to the *Ker–Frisbie* rule, and prevents the government from bringing a defendant into the United States for the express purpose of prosecution. Although we agree that Congress has the power to create statutory exceptions to the *Ker–Frisbie* doctrine, we do not think that section 1472(n) creates such an exception.

We first consider the United States's contention that *Yunis* controls this case. *Yunis* addressed a similar question, but with one important difference. The defendant in *Yunis* had also been brought to the United States against his will for trial, and also argued that this meant that he had not been "afterward found in the United States" for purposes of section 1472(n). We concluded that the latter phrase "does not indicate the voluntariness limitation urged by Yunis," as the phrase was intended to implement the Hague Convention's requirement that states extradite or prosecute hijackers "present in" their territory, and this requirement applies irrespective of how the hijacker came to be there. *Yunis,* 924 F.2d at 1092.

But Yunis had originally been brought to the United States on "hostage-taking and other charges," and indicted for air piracy only while awaiting trial on these charges. The *Yunis* court considered this fact of some significance, noting that its task was to "determine whether, once arrested and brought to this country on those other charges, Yunis was subject to prosecution under the Antihijacking Act as well." *Id.* Rezaq, unlike Yunis, was brought to the United States for the specific purpose of prosecution on hijack-

ing charges. As authority for his contention that this distinction is controlling, Rezaq points to two cases in which courts reversed convictions because the United States had improperly manufactured an essential jurisdictional element of the offense. *See United States v. Coates,* 949 F.2d 104, 106 (4th Cir. 1991); *United States v. Archer,* 486 F.2d 670, 685–86 (2d Cir.1973). In both *Coates* and *Archer,* the defendant was prosecuted for a crime an element of which was that the defendant must use "a facility in interstate ... commerce." (In *Coates,* the crime was murder for hire, 18 U.S.C. § 1958(b)(2); in *Archer,* it was a racketeering offense, 18 U.S.C. § 1952 (the "Travel Act").) In both instances, federal officials attempted to satisfy the interstate commerce element of the offense by traveling out of state and telephoning the defendant, *Coates,* 949 F.2d at 105; *Archer,* 486 F.2d at 681–82; both cases found that this act amounted to manufacturing federal jurisdiction.

In both *Coates* and *Archer,* it was clear that, in creating jurisdiction, the government had contravened a central purpose of the underlying statute. For both statutes, it was appropriate to assume that the interstate commerce element was intended to allocate prosecutorial jurisdiction between federal authorities and state or local authorities, and therefore to limit federal jurisdiction. *See Archer,* 486 F.2d at 680 (noting that the court is "bound ... to consider the demands of federalism" in construing the Travel Act). The *Archer* court cited legislative history which further reinforced this conclusion. At the time the statute was enacted, Attorney General Kennedy "told the Senate Judiciary Committee that the act was necessary to aid local law enforcement officials in many instances where 'the top men of a given criminal operation resided in one State but conducted their illegal activities in another.'" 486 F.2d at 679 (quoting *Hearings on S. 1653–1658, S. 1665 before the Senate Judiciary Committee on the Attorney General's Program to Crush Organized Crime and Racketeering,* 87th Cong., 1st Sess. (1961) at 15–17). The government's action in *Archer* in itself creating the interstate commerce element thus extended the Travel Act beyond its intended purpose of permitting federal

officials to assist state officials in prosecuting this class of crime.

By contrast, there are no strong policies underlying section 1472(n) that render it inappropriate for the government to bring a defendant to the United States against his will for the specific purpose of prosecution. Neither the Hague Convention nor section 1472(n) appears to have been intended to establish a firm allocation of prosecutorial authority between nations. It is possible to imagine a treaty that would do so; for instance, in adopting a treaty to criminalize mislabeling of products, nations might decide that it was best for each country's consumer protection authorities to have the sole power to decide when and how mislabeling should lead to criminal charges, and draft the treaty accordingly. It might then be inappropriate for United States authorities to bring a foreign offender to the United States for trial under a criminal law enacted to implement this hypothetical treaty.

Here, however, we have already concluded that Article 4 of the Hague Convention, which addresses the assertion of national jurisdiction, is intended to establish a minimum set of circumstances in which states must assert jurisdiction, rather than to limit the circumstances in which they may do so. It follows that the Hague Convention was not intended to establish a compartmentalized scheme of national jurisdiction (like that in our hypothetical product-labeling treaty). Nor does section 1472(n) enact such a scheme. The Senate Report on the implementing legislation explained that section 1472(n) was included to implement Article 4(2) of the Convention, and therefore

> includes a special provision establishing jurisdiction over the offense of hijacking wherever it occurs anywhere outside the special aircraft jurisdiction of the United States but the alleged offender is later found in the United States. This is the so-called universal jurisdiction provision which makes hijackers outlaws wherever they are found.

S. Rep. No. 93–13 at 3–4 (1973). This passage—particularly its statement that the provision "makes hijackers outlaws wherever

they are found"—indicates that Congress saw section 1472(n) as permitting broad assertion of jurisdiction over hijackers. It shows no signs that Congress envisioned the provision as allocating jurisdiction between the United States and other nations.[3]

█ The question remains, then: what does the phrase "afterward found in the United States" mean? As we observed in *Yunis*, this phrase appears to have been intended to implement the Hague Convention's requirement that the United States either extradite or prosecute all hijackers "present in" its territory. *Yunis*, 924 F.2d at 1092. Thus, the word "found" means only that the hijacker must be physically located in the United States, not that he must be first detected here. Rezaq notes that the fact that a defendant is present before a United States court necessarily implies that he is "found in the United States," so that the latter requirement will always be satisfied. But this does not mean that this language is empty of meaning; at a minimum, it confirms the rule, issuing from the Confrontation Clause of the Sixth Amendment and from the Due Process Clause, that a defendant ordinarily may not be tried in absentia. *See United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (per curiam).[4]

---

**3.** Rezaq has not argued that he should have been brought to the United States through extradition, rather than being brought here by force. We therefore do not reach the question of whether the extradition provisions of the Hague Convention, when they apply, are the exclusive route by which a defendant may be brought into the United States. *Cf. Alvarez–Machain*, 504 U.S. at 664, 112 S.Ct. at 2193–94 (rejecting a similar claim under the United States's extradition treaty with Mexico).

**4.** Rezaq also points out that Congress revised section 1472(n) in 1996, and asserts that our reading of the "afterward found" language would render much of the revised statute surplusage. The revised statute, which now appears at 49 U.S.C. § 46502(b), provides in relevant part:

(2) There is jurisdiction over the offense in paragraph (1) if—

(A) a national of the United States was aboard the aircraft;

(B) an offender is a national of the United States; or

## C. *The "Death Results" Provision*

█ Rezaq avers that it was improper for the district court to apply section 1472(n)'s "death results" provision (that is, its provision requiring the imposition of the death sentence or of life imprisonment in cases in which death results), as the Hague Convention only permits states to punish additional crimes associated with a hijacking if certain jurisdictional prerequisites are met.

Rezaq's argument is based on the text of Articles 4(1) and 4(2) of the Hague Convention. Article 4(1) provides that Contracting States "shall" establish jurisdiction over both the hijacking offense *and* "any other act of violence against passengers or crew" (a) "when the offence is committed on board an aircraft registered in that State," (b) "when the aircraft on board which the offence is committed lands in [the State's] territory with the alleged offender still on board," or (c) "when the offence is committed on board an aircraft leased without crew to a lessee" that is based in the state in question. When an offender is present in a state's territory without these additional connections being present, the Convention only requires the state to assert jurisdiction "over the offence," and not over the associated acts of violence. Article 4(2).

(C) an offender is afterwards found in the United States.

49 U.S.C. § 46502(b). · Rezaq argues that, under our reading of "afterward found," every case will always be within section 46501(2)(C), as a defendant who is before a United States court will always be present in the United States; thus, he argues, under this reading sections (A) and (B) of the statute become unnecessary. Congress may well have had good reasons to include the three alternative bases of jurisdiction in section 46501(2). For example, some of the United States's extradition treaties require that, in order to obtain custody over a fugitive, the United States present an arrest warrant to the other state. *See, e.g.*, Agreement for the Surrender of Fugitive Offenders, Dec. 6, 1996, U.S.-Hong Kong, Art. 8, 36 I.L.M. 847, 852. Although we do not decide this question, we note that the United States might find it difficult to obtain an arrest warrant for a fugitive in Hong Kong under a statute that provides that the offender be "found in the United States"; the alternative bases of jurisdiction may thus serve as long-arm provisions.

Rezaq argues that, because none of the three jurisdictional elements listed in Article 4(1) is present here, this case must fall within Article 4(2); thus, he claims, it is not appropriate to try him for his "other acts of violence." But Article 4(3) expressly provides that the Convention "does not exclude any criminal jurisdiction exercised in accordance with national law." Thus, if Congress wished to reach "other acts of violence," the Hague Convention allowed it to do so.

It is abundantly clear that Congress intended for the "death results" provision of section 1472(n) to apply irrespective of whether the additional jurisdictional elements of Article 4(1) are present. Indeed, it would seem that the *only* purpose of the "death results" provision of section 1472(n) is to reach cases in which these additional elements are absent, because if any of the Article 4(1) jurisdictional elements is present, the relevant statute is not section 1472(n), but section 1472(i). This is because section 1472(n) applies only to offenses committed "aboard an aircraft in flight outside the special aircraft jurisdiction of the United States." The "special aircraft jurisdiction of the United States" is defined in 49 U.S.C. app. § 1301(34) (1994); that provision includes, among others, subsections that correspond to subsections (a), (b), and (c) of Article 4(1) of the Hague Convention. Thus, if the additional jurisdictional elements of Article 4(1) are present, the relevant criminal provision will be section 1472(i), which applies to hijackings within the "special aircraft jurisdiction of the United States." [5] *See also* H.R.Rep. No. 93–885, at 12 (1974), U.S. Code Cong. & Admin. News at 3975, 3986 (explaining that an adjustment to section 1472(i) was intended to "make the penalty which may be imposed for 'aircraft piracy' committed *within* the special aircraft jurisdiction of the

United States identical with the penalty which may be imposed for such offense when committed *outside* the special aircraft jurisdiction of the United States."). The "death results" provision of section 1472(n) therefore cannot, as a rule, apply to cases in which the additional jurisdictional elements listed in Article 4(1) are present; such cases will instead come within section 1472(i), which has its own "death results" provision. Rezaq's proposed reading of the "death results" provision of section 1472(n) would thus render it totally irrelevant.

Rezaq also argues that applying the "death results" provision to this case would violate the normal jurisdictional rules of international law. International law imposes limits on a state's "jurisdiction to prescribe," that is, its ability to render its law applicable to persons or activities outside its borders; states may only exercise jurisdiction to prescribe under a limited number of theories. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 401 (1987). This case, however, clearly falls within at least one such theory, the so-called "passive personality principle." That principle "asserts that a state may apply law—particularly criminal law—to an act committed outside its territory by a person not its national where the victim of the act was its national." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402 cmt. g (1987). "The principle has not been generally accepted for ordinary torts or crimes, but it is increasingly accepted as applied to terrorist and other organized attacks on a state's nationals by reason of their nationality. . . ." *Id.* Scarlett Rogenkamp was a United States citizen, and there was abundant evidence that she was chosen as a victim because of her nationality. This suffices to support jurisdiction on the passive personality theory.[6]

---

5. In 1994, 49 U.S.C. § 1472(i) and (n) became 49 U.S.C. § 46502(a) and (b), respectively; the point made in the text remains valid as to these new provisions.

6. Of course, Congress did not expressly limit the reach of the "death results" provision to cases in which the death was that of an American citizen killed because of her nationality. International law might permit the United States to assert jurisdiction in other situations; hijacking crimes

are subject to universal jurisdiction, *see* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 404, and the same may be true of deaths resulting from a hijacking. We do not decide this question.

Had we found that Congress exceeded its jurisdiction to prescribe under international law in enacting the "death results" provision, we would have then needed to decide whether we should enforce the "death results" provision nevertheless. *Compare* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 114 ("Where fairly possible, a Unit-

## D. Evidence as to the Deaths of Passengers

Rezaq repeatedly sought to prevent the jury from learning about the deaths of passengers aboard the Air Egypt plane, and to insulate the jury from details of those deaths. He moved unsuccessfully to strike a reference in the indictment to the deaths of passengers he shot, and to bifurcate the trial into two phases, one addressing the hijacking, and the second the resulting deaths. He also offered to stipulate to the fact and manner of the hostages' deaths; the United States declined to stipulate, and the district court refused to compel it to do so. Rezaq also, without success, opposed the United States's efforts to introduce into evidence graphic details of Scarlett Rogenkamp's autopsy, including photographs, autopsy reports, and the testimony of a pathologist. Finally, Rezaq sought unsuccessfully to prevent the United States from adverting to the fact that 57 passengers died when the Egyptian commandos stormed the plane. Rezaq argues that the district court's rulings on all of these issues were erroneous.

### 1. Motion to Strike

 We first discuss Rezaq's motion to strike from the indictment references to the deaths of Mendelson and Rogenkamp, and to the attempted killing of the other three passengers. Such motions are permitted under Federal Rule of Criminal Procedure 7(d); "a motion to strike surplusage [from the indictment] should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." 1 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 127, at 426 (1982); see also United States v. Huppert, 917 F.2d 507, 511 (11th Cir.1990). Such a motion "is addressed to the discretion of the court," WRIGHT, supra, at 426; "[t]he standard under Rule 7(d) has been strictly construed against striking surplusage." United States v. Jordan, 626 F.2d 928, 930 n. 1 (D.C.Cir.1980).

The district court was well within its discretion in concluding that the prejudicial effect of these references did not outweigh their relevance. The district court observed that an element of air piracy under section 1472(n) is that the defendant "unlawfully, by force or threat thereof, or by any other form of intimidation, seizes, or exercises control of" an aircraft. See United States v. Rezaq, 908 F.Supp. 6, 9 (D.D.C.1995). The fact that Rezaq shot several passengers was clearly relevant to establishing that he had seized the aircraft, and later maintained control of it, by "force" or by "intimidation."

### 2. Motion to Bifurcate

 Rezaq also moved to bifurcate the proceedings, and have the jury first consider whether he had committed the offense of air piracy, as defined in section 1472(n), and then decide whether the "death results" provision in section 1472(n)(1)(B) applied. He asserted that the "death results" provision was simply a penalty enhancement provision, so that such bifurcation was necessary. The district court disagreed, finding that the "death results" provision was an element of the substantive offense defined by section 1472(n), and that severance should therefore be denied.

This court has wrestled with such problems before. In both United States v. Jackson, 824 F.2d 21 (D.C.Cir.1987), and in United States v. Michael, 10 F.3d 838 (D.C.Cir. 1993), we were faced with the question of whether a statutory provision created two substantive offenses, or only one offense with the possibility of an enhanced penalty. Jackson involved a firearms statute that subjected those with previous convictions to higher penalties; Michael, a drug statute that applied higher penalties to possession of crack cocaine. The statutes we construed in Jackson and Michael and the one before us here all lack traits that might easily classify them as either creating two substantive offenses or creating one offense with an enhanced penalty. Each lacks " 'common indi-

ed States statute is to be construed so as not to conflict with international law or with an international agreement of the United States") with Federal Trade Comm'n v. Compagnie de Saint–Gobain–Pont–a–Mousson, 636 F.2d 1300, 1323 (D.C.Cir.1980) (stating that we are "obligated to give effect to an unambiguous exercise by Congress of its jurisdiction to prescribe even if such an exercise would exceed the limitations imposed by international law").

cia of sentence-enhancement provisions'" like "an explicit reference to a conviction ..., procedures for a sentencing hearing, a penalty derived as a multiplier of another offense, or a title indicating that it is a sentence-enhancement provision." *Jackson,* 824 F.2d at 23 (quoting *United States v. Davis,* 801 F.2d 754, 755–56 (5th Cir.1986)). But the statutes also do not expressly define two separate offenses; instead, they merely "'specif[y] one of the preceding classes of persons ... for different treatment.'" *Jackson,* 824 F.2d at 23 (quoting *United States v. Hawkins,* 811 F.2d 210, 219 (3d Cir.1987)).

In *Jackson,* we found that the fact of a defendant's prior conviction was a sentence enhancement, not an element of a substantive offense. The legislative history of the statute expressly treated this factor as a sentence enhancement, and we also observed that it would be highly prejudicial for the jury to consider this factor in deciding the defendant's guilt. *See Jackson,* 824 F.2d at 25–26. In *Michael,* by contrast, introducing evidence at trial that a drug was cocaine base would not have created an unusual risk of prejudice. Instead, we reasoned that, because treating this factor as a sentence enhancement would "shift[ ] the issue [of the nature of the drug] from jury to court and deny[ ] the defendant the benefit of the reasonable doubt standard, ... we are reluctant to infer such classification in the absence of a reasonably clear statement from Congress, at least for a fact embedded in the statutory section defining the crime and closely related

to the circumstances of the crime." *Michael,* 10 F.3d at 842 (citation omitted). We found no such clear statement in the statute or its legislative history, and so treated this factor as an element of a distinct offense.

The evidence before us is somewhat more equivocal than that in *Michael.* Section 1472(n)(1)(A) and section 1472(n)(1)(B) (in which the "death results" provision appears) are both introduced by the phrase "shall be punished," and both list punishment options, suggesting the "death results" factor relates to punishment, not to guilt or innocence.[7] We do not think, however, that the placement of the "death results" factor after the phrase "shall be punished" should be accorded controlling weight. The structure of section 1472(n) is complex: it states the elements of "'an offense,' as defined in the [Hague Convention]" in section 1472(n)(2), but then adds further substantive elements to this offense in section 1472(n)(1), including the requirement that the offense be committed "aboard an aircraft in flight outside the special aircraft jurisdiction of the United States" and that the defendant be "afterward found in the United States." Given this convoluted structure, it should not be that surprising to find still another additional element, defining an additional substantive offense, in section 1472(n)(1)(B), after the statute appears to have changed the subject to "punishment."[8]

The United States also points to the structural relationship of section 1472(n) to another statutory provision, section 1473(c)(2).

7. The relevant section of the statute provides that a defendant "shall be punished (A) by imprisonment for not less than 20 years; or (B) if the death of another person results from the commission or attempted commission of the offense, by death or imprisonment for life." 49 U.S.C. app. § 1472(n)(1).

8. Indeed, in the legislative history of section 1472(n)(1), the House Committee on Interstate and Foreign Commerce described the function of section 1472(n)(1) as a whole as to "provide[] penalties," but then immediately qualified this statement:

> Paragraph (1) of the new subsection (n) provides penalties for any person who commits an "offense" (as defined in the Hague Convention) aboard an aircraft in flight outside the special aircraft jurisdiction of the United States, and is

afterward found in the United States. This paragraph provides for a penalty of imprisonment for not less than 20 years, or, if the death of another person results from the commission or attempted commission of an "offense," the penalty may be death or imprisonment for life. The imposition of the death penalty is subject to the procedural requirements set forth in section 105 of the reported bill, discussed in detail below.

H.R.Rep No. 93–885, at 12 (1974). Congress thus seems to have seen *all* of section 1472(n)(1) to relate to penalties, but nonetheless included in that subsection elements of the substantive offense of air piracy. We read the "death results" provision to be just one more such element. *Cf. Michael,* 10 F.3d at 841–42 (noting that congressional references to increased penalties need not always signal penalty enhancements, but may at times indicate the creation of a distinct offense).

Under that provision, a death-penalty sentencing hearing must be held when a defendant "is found guilty of or pleads guilty to an offense under section 1472(i) or 1472(n) of this title for which one of the sentences provided is death." 49 U.S.C. app. § 1473(c)(2). The death-penalty sentencing hearing is to occur "before the jury which determined the defendant's guilt." § 1473(c)(2)(A). The hearing may also occur before "a jury impaneled for the purpose of the hearing," but only if the defendant had pleaded guilty, was convicted in a trial without a jury, or if "good cause" existed to discharge the previous jury. § 1473(c)(2)(B). Finally, the hearing may be "before the court alone," but only "upon the motion of the defendant and with the approval of the court and the Government." § 1473(c)(2)(C).

Construing the "death results" provision as a penalty enhancement would be markedly at odds with the structure and purposes of section 1473(c). Section 1473(c) is triggered whenever a defendant "is found guilty of or pleads guilty to an offense under sections 1472(i) or 1472(n) of this title for which one of the sentences provided is death." If section 1472(n) does not define two distinct crimes, then a defendant cannot be "found guilty of or plead[ ] guilty to an offense ... for which one of the sentences provided is death"; a defendant can only be found guilty of or plead guilty to a generalized offense under section 1472(n). Before section 1473(c) could apply, there would need to first be a guilty plea or guilty verdict; then an intermediate proceeding, presumably tried to the court (the usual rule at sentencing proceedings) as to whether "death resulted"; and then, if necessary, the death-penalty sentencing hearing provided for in section 1473(c). This structure is inconsistent with the language of section 1473(c), which contemplates a verdict that leads directly into a death-penalty sentencing hearing. It also ignores the strong policy expressed in section 1473(c) of trying all matters related to the imposition of the death sentence to a jury, where possible. If Congress intended to establish an ornate, three-stage procedure for the imposition of the death sentence in air piracy cases—with the middle stage, and only that stage, tried to the court—it would presumably have said

so explicitly, either in the statute or in its legislative history. Neither contains any indication that this is what Congress intended.

This is an appropriate case then in which to apply *Michael*'s rule that "we are reluctant to infer ... classification [as a penalty enhancement] in the absence of a reasonably clear statement from Congress, at least for a fact embedded in the statutory section defining the crime and closely related to the circumstances of the crime." *Michael*, 10 F.3d at 842. The fact that a death resulted from a hijacking is "closely related" to the circumstances of the hijacking; indeed, this fact will ordinarily be admissible at trial, to prove that the defendant used force or intimidation in committing the crime. *Cf. United States v. Rivera–Gomez*, 67 F.3d 993, 996 (1st Cir. 1995). As to the statute's structure, we have found that Congress did not clearly demarcate factors related to guilt from those related to punishment in drafting section 1472(n), and that the need to harmonize section 1472(n) with section 1473(c) militates against the penalty-enhancement reading.

We recognize that our reading of the "death results" provision of section 1472(n) is at odds with the prevailing judicial interpretation of a number of other statutes that incorporate "death results" provisions. Under federal statutes criminalizing arson, *see United States v. Ryan*, 9 F.3d 660, 667–69 (8th Cir.1993), *vacated in part on other grounds*, 41 F.3d 361 (1994) (interpreting 18 U.S.C. § 844(i)), carjacking, *see Rivera–Gomez*, 67 F.3d at 996 (1st Cir.1995) (interpreting 18 U.S.C. § 2119); *United States v. Williams*, 51 F.3d 1004, 1009 (11th Cir.), *cert. denied*, 516 U.S. 900, 116 S.Ct. 258, 133 L.Ed.2d 182 (1995) (same), and certain civil rights violations, *see Catala Fonfrias v. United States*, 951 F.2d 423, 424–25 (1st Cir.1991) (interpreting 18 U.S.C. §§ 241, 242), courts have read similarly-worded "death results" provisions as imposing penalty enhancements, not as creating separate offenses. We do not think that these cases conflict with our disposition here. Those cases generally turned on factors, such as legislative history, specific to the statutes in question. *See, e.g., Ryan*, 9 F.3d at 668; *Catala Fonfrias*, 951 F.2d at 427. They also relied on structural

features of the statutes in question, like the fact that they only "single[d] out a subset of [criminals] for more severe punishment." *Ryan*, 9 F.3d at 667. We found in *Jackson*, however, that structural cues of this kind may not be dispositive in the face of other contextual evidence. *See Jackson*, 824 F.2d at 23–24. Here, the unusual relationship of sections 1472(n) and 1473(c)(2) leads us to conclude that the "death results" provision must be classified as an element of a substantive offense. We therefore affirm the district court's ruling that Rezaq was not entitled to a bifurcated proceeding.

### 3. *The Proffered Stipulation*

 Rezaq offered to stipulate that Mendelson and Rogenkamp had died, and claims that the district court should have compelled the United States to accept his offer. In *Old Chief v. United States*, —— U.S. ——, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), the Supreme Court reaffirmed the general rule that "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." *Id.* at ——, 117 S.Ct. at 654. *Old Chief* established an exception to this rule for crimes like possession of a firearm by a convicted felon, in which the evidentiary issue is one of "status," *id.* at ——, 117 S.Ct. at 655, but that exception does not apply to this case, and Rezaq has not established that any other exception should apply. Thus, the United States was free to decline to stipulate.

### 4. *Rogenkamp's Autopsy*

 The United States presented extensive evidence at trial relating to Rogenkamp's autopsy. This included the testimony of a pathologist, who described the autopsy in considerable clinical detail, and testified that Rezaq's bullet had caused Rogenkamp's death; the pathologist also discussed the cause of Mendelson's death on the basis of autopsy records that he had reviewed. The United States also introduced an autopsy report, and a number of enlarged photographs from the autopsy, which were placed on an easel near the jury box; the United States displayed the photographs again during closing arguments.

Rezaq had filed a motion in limine seeking to exclude this evidence as overly prejudicial. Federal Rule of Evidence 403 permits the district court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R.EVID. 403. The district court accordingly weighed the probative value of this evidence against the danger of unfair prejudice. As to probative value, the district court found the evidence relevant to both the "force or intimidation" element of the statute and the "death results" element. The district court found that the autopsy reports were highly probative as to the fact of Rogenkamp's death, as to its cause, and as to "the fact that the killings were intentional." It found that the autopsy photographs were likewise "highly probative" as to the first two of these factors, the fact and cause of death.

In weighing the prejudicial effect of this evidence, the district court found that the autopsy reports had no prejudicial effect, as they were "straightforward and factual," and nothing in them was likely to inflame the jury. It observed that some of the autopsy photographs similarly presented no danger of prejudice; others it found were "more graphic in nature," but it concluded that, "[i]n light of the highly probative value of these particular photographs," the danger of unfair prejudice did not substantially outweigh the evidence's probative value.[9] Rezaq asserts that the district court erred in admitting this evidence.

 "We review Rule 403 determinations most deferentially and will reverse only for 'grave abuse' of the trial court's discretion." *United States v. Johnson*, 46 F.3d 1166, 1171 (D.C.Cir.1995) (quoting *United States v. Manner*, 887 F.2d 317, 322 (D.C.Cir.1989)). Here, although we might not have admitted at least one of the most grisly photographs into evidence, we cannot say that the district court's decision to do so amounted to "grave abuse."

---

**9.** In two of the autopsy photographs, Rogenkamp was unclothed. The United States offered to edit the photographs, and the district court permitted them to be introduced on this condition. They appear never to have been introduced, however.

We begin with the evidence's probative value. The fact that death resulted from the hijacking was an element of the offense with which Rezaq was charged. The autopsy report, the testimony of the pathologist, and the photographs all demonstrated that it was Rezaq's bullets that killed Rogenkamp and Mendelson. The fact that Rezaq's victims died is also relevant to the "force and intimidation" element of the statute. *See Rivera–Gomez*, 67 F.3d at 996 (1st Cir.1995) ("It is difficult to conceive of a situation in which the death of a victim would not be relevant to the use of force and violence during the commission of an attempted carjacking."). The autopsy evidence corroborated the government's account of the way in which Rezaq used systematic executions to maintain control of passengers and airport personnel.

■ Based on this analysis, we can dismiss the autopsy report and the pathologist's testimony from consideration immediately. Both had some small prejudicial effect, as they presented unsettling details of the way in which Rezaq's victims died; but this effect does not "substantially outweigh" the evidence's probative value. All but one of the autopsy photographs that were introduced into evidence fell into the same category. These photographs were fairly antiseptic; they included three photographs of the entry wound in Rogenkamp's head, an x-ray image of her skull with the bullet embedded in it, and a photograph of the bullet itself. The harder case is a close-up photograph showing the removal of the bullet from Rogenkamp's skull. This photograph was notably graphic: in it, a large triangular portion of the skin on Rogenkamp's skull has been removed, revealing bone, tissue, and a large quantity of blood (as well as the bullet).

■ "Blood will have blood," WILLIAM SHAKESPEARE, MACBETH, Act 3, sc. 4; accordingly, photographs of gore may inappropriately dispose a jury to exact retribution. A number of courts have recognized this principle. For instance, in *Ferrier v. Duckworth,*

902 F.2d 545, 548 (7th Cir.1990), the court found it improper to admit photographs, "in color and enlarged to twelve square feet," of the victim's blood on the floor of a bar, as the blood "was not relevant to any issue in the case," and "[t]he only conceivable reason for placing [the photographs] in evidence was to inflame the jury" against the defendant. *Id.* at 548. *See also Gomez v. Ahitow*, 29 F.3d 1128, 1139 (7th Cir.1994) (similar). The fact that the photograph in this case was taken in a clinical setting somewhat reduced its prejudicial effect, but the photograph nevertheless created some risk of prejudice. Nor was its probative value great. Autopsy photographs can have immense probative value, if for example they confirm the prosecution's theory about the manner in which the crime was committed. *See United States v. Cruz–Kuilan*, 75 F.3d 59, 61 (1st Cir.1996) (autopsy photographs confirmed witness's account of the crime, establishing that bullets fired by defendant had indeed passed through the body of the victim and injured the witness). Here, however, the photograph only provided further corroboration that Rogenkamp was shot in the head; because the bullet was visible in the other photographs, this point did not especially need elucidation.[10]

Although some might have doubts about the prudence of admitting this photograph into evidence, we cannot say that the district court's decision to do so amounted to "grave abuse." The photograph did have some probative value, and its prejudicial effect, although significant, was not extreme. "The trial judge's exercise of discretion in balancing the prejudicial effect and probative value of photographic evidence of this type is rarely disturbed." *United States v. Goseyun*, 789 F.2d 1386, 1387 (9th Cir.1986).

### 5. *The Storming of the Plane*

■ Rezaq also sought to bar the United States from introducing into evidence the fact that 57 passengers died in the Egyptian commandos' ill-fated storming of the plane. The district court denied his motion, finding

**10.** The United States also maintains that it was appropriate to use the autopsy evidence to attack Rezaq's defense of obedience to orders, as obedience to orders is not a defense if the orders are plainly unlawful. But it would seem that the more direct way to show that Rezaq's orders were plainly unlawful *ex ante* is to show what those orders were, not how Rezaq carried them out.

that the United States could reasonably contend that Rezaq's claimed posttraumatic stress disorder only developed after the hijacking, and that the storming of the plane could have contributed to the symptoms his experts had identified. At trial, the United States brought up the storming of the plane in precisely this context, while cross-examining Rezaq's experts on posttraumatic stress disorder.

The fact that 57 passengers died in the storming of the plane might well have been unfairly prejudicial. Even though these deaths were not at issue in the case, the jury could have concluded that someone should be punished for them; the relevant Egyptian officials were not before the court, so that Rezaq would have borne the brunt of the jury's ire. But, the facts surrounding the storming of the plane also had significant probative value, as it could be argued that the traumatic effects of this incident were comparable to the effects of many of the incidents Rezaq himself cited as causes of his asserted PTSD. We therefore find that the district court's decision to admit the evidence was an appropriate application of Rule 403.[11]

### E. Mid–Trial Publicity

█ The night after the government's closing argument, on Wednesday, July 17, 1996, TWA Flight 800 crashed off the coast of Long Island, on its route from New York to Paris. The disaster was covered extensively in various media; indeed, one survey indicated that it was the most heavily covered news event of 1996. News coverage was filled with speculation as to the cause of the crash, and one frequently cited theory was that terrorists (perhaps from the Middle East) were responsible. News coverage also observed that the plane had previously flown out of Athens, which one article (in the *Washington Post*) said was "known as a base for terrorists." Don Phillips, *747 Explodes with 229 Aboard*, WASHINGTON POST, July 18, 1996, at A1, A19. Athens, of course, was

where Rezaq and his confederates boarded the Air Egypt flight.

The jury had not been sequestered or instructed to avoid news coverage, and was thus presumably exposed to the initial news of the crash. On the morning after the crash, at the request of Rezaq's counsel, the district court told the jury that the crash was unrelated to the case and to put the event out of their minds. Rezaq's counsel did not, however, ask that the jury be told to avoid further news coverage, and they were not given any such instruction. Rezaq's counsel gave his closing argument that same day, and the jury began to deliberate that afternoon. On the following day, Friday, July 19, after further news coverage speculating about terrorism, Rezaq moved for a mistrial; the motion was denied. That afternoon, the jury returned a guilty verdict. Rezaq now argues that the district court erred in declining to grant his motion for a mistrial, and, in the alternative, that the district court should have conducted individual *voir dire* of the jurors, and that its failure to do so requires that he receive a new trial.

█ Given that it is quite unlikely that publicity about an unrelated air crash could impair a jury's ability to remain impartial, we find that the district court's response to the publicity was appropriate in all respects. This court has adopted a three-part approach for district courts to apply in addressing potentially prejudicial media influence on the jury. The court is to (1) decide whether the material is prejudicial, (2) decide whether jurors were exposed to it, and (3) examine jurors to see if they can remain impartial. *See United States v. Williams–Davis*, 90 F.3d 490, 501 (D.C.Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 986, 136 L.Ed.2d 867 (1997). As to the second factor, the jurors hardly could have avoided exposure. As to the first, we find that there was at most a modest risk of prejudice. In most cases involving prejudicial publicity during trial, the publicity relates directly to the issues in the trial itself; here, the publicity

---

11. The district court also concluded that the storming of the plane was relevant to the timing of the *end* of the hijacking, which is defined by section 1472(n) as the time that the aircraft is restored to the control of "competent authori-

ties." It was not contested that Rezaq was in control of the aircraft for an extended period of time; the precise timing of the end of the hijacking was not relevant to any issue in the case.

was about an unrelated event that might have indirectly influenced the jury's perceptions of the case before it. Given the magnitude of the crash, the saturation news coverage, and the speculation that terrorists were to blame, it is theoretically possible that the sensibilities of some jurors might have been affected, heightening their reluctance to consider on their merits Rezaq's defenses of insanity and obedience to orders.[12]

■■■ Turning to the third element of *Williams–Davis*, Rezaq complains that the district court, rather than conducting an individual voir dire, only questioned the jury as a whole as to whether it could remain impartial. Although "the method of conducting the voir dire is left to the sound discretion of the district court," *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir.1993), the collective *voir dire* is not ordinarily the instrument of choice for discerning the impartiality of jurors. *See Coppedge v. United States*, 272 F.2d 504, 508 (D.C.Cir.1959) ("It is too much to expect of human nature that a juror would volunteer, in open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial."). Here, however, the district court found, and Rezaq's counsel agreed, that it was important to avoid linking the crash with the trial in the jurors' minds, and that a single general question, directed to the jury as a whole, was the most appropriate way to accomplish this goal. Given the close involvement of his counsel in the process of formulating the court's response to the crash, Rezaq cannot object now to the approach the district court adopted. Indeed, Rezaq's counsel has effectively conceded on this appeal that he made a strategic decision not to seek an individual *voir dire*, saying that "[s]uch a suggestion from counsel would have undercut the defense position that nothing could be done to alleviate the prejudice short of a mistrial."

■■■ Nor did the district court err in declining to declare a mistrial. The risk of prejudice from the crash-related publicity, although real, was somewhat reduced by the fact that the district court instructed the jurors to put the publicity out of their minds. On balance, the risk falls short of that degree of significance which has in other cases been found to warrant a new trial. *See, e.g., Waldorf v. Shuta*, 3 F.3d 705, 711 (3d Cir.1993) (jurors brought relevant news article into the jury room and discussed it there); *United States v. Littlefield*, 752 F.2d 1429, 1432 (9th Cir.1985) (similar); *United States v. Lord*, 565 F.2d 831, 838 (2d Cir.1977) (news coverage revealing prejudicial information about the defendant).

## F. Restitution

The district court ordered that Rezaq pay a total of $254,000 in restitution to seven victims. Rezaq argues that the district court erred in the manner in which it calculated the amount of his restitution, both in failing to consider his ability to pay, and in failing to demand more detailed proof of the amount of the victims' losses.

### 1. Ability to Pay

■■■ The provision under which the district court ordered restitution states:

> The court, in determining whether to order restitution under section 3579 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a). Rezaq claims that the district court failed to consider his "financial resources" and his "earning ability" in set-

---

12. The emotionally compelling nature of the crash distinguishes this case from *United States v. Holton*, 116 F.3d 1536, 1548 (D.C.Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 736, —— L.Ed.2d —— (1998), in which we found it "extremely unlikely" that a report on ABC's "Nightline" on sentencing of crack cocaine offenders could have tainted the jury. *Holton* was about a fairly obscure broadcast on an issue of public policy; here, the publicity was about what the *Washington Post* repeatedly called a "tragedy." *See* Rene Sanchez and Serge F. Kovaleski, *TWA Travelers' Tragedy is Felt Across the Nation*, Washington Post, July 19, 1996, at A1.

ting the amount of his restitution, and that this was error.[13]

In *United States v. Bapack,* 129 F.3d 1320 (D.C.Cir.1997), we set forth our interpretation of section 3364's requirement that the district court "shall consider" these factors. We found that it was appropriate to treat orders of restitution as we do fines; as to fines, "where the record demonstrates that the judge considered [a] factor before imposing the fine, the appellate court will not reverse the fine merely because no express finding was made but will review the finding of ability to pay necessarily implied by such consideration." *See Bapack,* 129 F.3d at 1328 (quoting *United States v. Mastropierro,* 931 F.2d 905, 906 (D.C.Cir.1991)).

■ The record demonstrates that the district court considered Rezaq's ability to pay in setting the amount of its restitution order. As to Rezaq's present ability to pay, the district court ordered at sentencing that "[t]he $850 in the registry of the court will be paid to the victims," demonstrating that it knew the (limited) extent of Rezaq's assets. As to Rezaq's future earning ability, the district court could hardly have been ignorant of the fact that Rezaq's anticipated sentence would greatly restrict his earnings; imprisonment is rarely lucrative. In a brief filed with the district court, the United States argued that Rezaq might seek to write books or articles on his crimes, and thus might later have the resources to pay a large order of restitution. Rezaq's brief replied that this was quite unlikely to occur. Given the district court's demonstrated familiarity with Rezaq's present ability to pay, an issue addressed in the same set of briefs, it is fair to conclude that the district court made its ruling in light of those briefs, and hence considered the information they presented as to Rezaq's future earning ability. *Cf. United States v. Cannizzaro,* 871 F.2d 809, 811–12 (9th Cir.1989). We therefore find that there

is adequate evidence that the district court considered this factor.[14]

### 2. *Adequacy of Documentation*

■ The Probation Office provided the district court with copies of Victim Impact Statements from seven victims of the hijacking. The statements were very detailed, consuming a total of forty-two pages; the impacts they listed included extensive injuries and associated medical expenses, psychological harms, disruptions to the victims' lives, and loss of income and property. The record also included numerous signed statements from physicians, psychiatrists, and employers corroborating the victims' accounts of their losses; one victim also appended translations of newspaper articles and of an appellate brief relating to her unsuccessful efforts to obtain compensation in the Egyptian courts. The district court's order of restitution included all of the financial impacts listed in the victims' statements, including medical expenses, lost wages, and lost property.

■ "Any amount to be paid in restitution must be obtained by accurate computation and cannot exceed the amount of loss actually caused." *United States v. Forzese,* 756 F.2d 217, 222 (1st Cir.1985) (emphasis omitted). This rule protects both the rights of the defendant and those of the victims, who will often share the defendant's limited assets *pro rata* and who will therefore be harmed if another victim receives an improperly high award. The district court had sufficient evidence on which to base its award of restitution in this case. The documentation before the court was extensive, especially when considered in light of the fact that the crime was committed over ten years earlier. Awards of restitution are reviewed for abuse of discretion, *United States v. Henoud,* 81 F.3d 484, 487 (4th Cir.1996); we are satisfied that no such abuse occurred here.

---

**13.** Congress recently amended section 3364 in a way that appears to eliminate the requirement that the district court take these factors into account; the Ex Post Facto Clause prohibits the application of this amendment to Rezaq, however. *See United States v. Bapack,* 129 F.3d 1320, 1327 n. 13 (D.C.Cir.1997).

**14.** Nor does the fact that Rezaq's future earnings are speculative necessarily require that the district court award a minimal amount of restitution. *See United States v. Fountain,* 768 F.2d 790, 802–03 (7th Cir.1985) (finding that the possibility that the defendant would sell his story sufficed to indicate that he might someday be able to satisfy a high amount of restitution).

## G. *Classified Materials*

 When classified materials may be relevant to criminal proceedings, the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III (1994), provides procedures designed to protect the rights of the defendant while minimizing the associated harm to national security. In the course of preparing for trial, the United States identified a number of arguably discoverable classified materials, and obtained permission from the district court to file an *ex parte, in camera* motion for a protective order. After reviewing this motion and the accompanying documents, the district court ordered the United States to prepare an index listing the contents of each document, whether it believed the document to be subject to discovery, and why. This document, too, was submitted *ex parte* and *in camera*; the district court subjected this document to detailed review, and prepared a list of the materials that it considered discoverable.

Under CIPA, the court may allow the United States to disclose "a statement admitting relevant facts that the classified information would tend to prove," in lieu of disclosing the information itself. 18 U.S.C. app. III § 4 (1994). The United States sought, and obtained, permission to substitute admissions for all of the documents that the district court had identified as discoverable. The district court reviewed the United States's proposed substitutions, and concluded that they fairly stated the relevant elements of the classified documents. The substitutions were then disclosed to Rezaq's attorney.

Rezaq's request on appeal is very limited. He does not ask us to review the district court's determination as to which documents were discoverable in the first instance. Instead, he asks only that we review the documents that the district court found to be discoverable, and decide whether the sum-

maries that the court furnished to him were as helpful to his defense as the original documents would have been. He is particularly concerned that the summaries may have omitted important information, or that the process of transforming the documents into desiccated statements of material fact might have hampered the "evidentiary richness and narrative integrity" of the defense he was able to present. *Old Chief,* —— U.S. at ——, 117 S.Ct. at 651.

 We found in *Yunis* that a defendant seeking classified information is not entitled to receive it "on a mere showing of theoretical relevance," but "is entitled only to information that is at least 'helpful to the defense of the accused.'" 867 F.2d at 623 (quoting *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957)). This principle applies to sub-elements of individual documents; if some portion or aspect of a document is classified, a defendant is entitled to receive it only if it may be helpful to his defense. A court applying this rule should, of course, err on the side of protecting the interests of the defendant. In some cases, a court might legitimately conclude that it is necessary to place a fact in context in order to ensure that the jury is able to give it its full weight. For instance, it might be appropriate in some circumstances to attribute a statement to its source, or to phrase it as a quotation. As the Court said in *Old Chief,* "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." —— U.S. at ——, 117 S.Ct. at 654.[15]

 The district court's substitution decisions turned on the relevance of the facts contained in the discoverable documents, and are therefore reviewed, like other relevance decisions under CIPA, for abuse of discretion. *See United States v. Yunis,* 867 F.2d

---

**15.** Of course, this contextual information may be precisely the sort of information that the government most wishes to protect; frequently, "the government's security interest ... lies not so much in the contents of [a] conversation[ ], as in the time, place and nature of the government's ability to intercept the conversation[ ] at all." *Yunis,* 867 F.2d at 623.

After the court has identified the material that is helpful to the defendant, there may be a third step to the court's analysis, in which it balances the defendant's interest in disclosure against the government's interest in secrecy. We have reserved the question of whether such balancing is proper. *See id.* at 625.

617, 625 (D.C.Cir.1989). We are obliged to consider the district court's substitution decisions very carefully, as Rezaq's counsel is unable to consult the original documents, and so cannot present arguments on his client's behalf. We have accordingly conducted a detailed *in camera* comparison of the originals of the discoverable documents with the summaries approved by the district court. We find that the district court did a commendable job of discharging its obligations under CIPA, and in particular that its orders protected Rezaq's rights very effectively despite the fact that Rezaq's attorney was unable to participate in the CIPA proceedings. No information was omitted from the substitutions that might have been helpful to Rezaq's defense, and the discoverable documents had no unclassified features that might have been disclosed to Rezaq.

### III. CONCLUSION

We therefore conclude that all of Rezaq's arguments on this appeal are without merit. We reject his sequential-prosecution argument, finding that neither the Hague Convention nor section 1472(n) contains any bar on sequential prosecution more restrictive than that in the Double Jeopardy Clause. As to his claim that the United States manufactured jurisdiction over him, we conclude that section 1472(n)'s "afterward found in the United States" language did not preclude jurisdiction even though the United States brought Rezaq into its territory against his will for trial. Nor is section 1472(n)'s "death results" provision subject to any special jurisdictional requirements of its own.

Turning to Rezaq's claims that prejudicial evidence was introduced at his trial, we find that Rezaq was not entitled to have references to his victims' deaths stricken from the indictment, to have the proceedings bifurcated, or to have the United States stipulate to the deaths, and that the district court did not overstep its discretion in permitting the United States to introduce evidence relating to the autopsies of his victims at trial. The fact that 57 passengers died during the storming of the plane was also properly admitted, as it provided a possible alternate cause of Rezaq's post-traumatic stress disor-

der. We also conclude that the publicity surrounding the crash of TWA Flight 800 was not so prejudicial as to entitle Rezaq to a retrial, and that Rezaq waived his right to have the jury polled individually. We also reject Rezaq's arguments that the district court failed to consider his ability to pay an award of restitution, that there was inadequate support for the district court's restitution order, and that the district court erred in substituting bare statements of fact for discoverable classified documents.

*So ordered.*